# EXHIBIT B
# PART I

Jones v. Wackenhut &#38;#8207; Google Inc.     Doc. 76 Att. 3

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONALD JONES,                    )
                                 )
      Plaintiff,                 )
                                 ) CIVIL ACTION FILE
vs.                              )
                                 ) NO.: 1:07-CV-0567-CC-RGV
WACKENHUT % GOOGLE, INC.,        )
                                 )
      Defendants.                )

- - -

Deposition of DONALD JONES, taken on

behalf of the Wackenhut Corporation, pursuant

to the stipulations agreed to herein before

Michelle J. Fuller, Certified Court Reporter, at

Duane Morris LLP, 1180 West Peachtree Street,

Suite 700, Atlanta, Georgia, on the 4th day of

February 2008, commencing at the hour of 10:15 a.m.

- - -



**thompson**
Reporting Services, Inc.
CERTIFIED COURT REPORTERS



6151 Powers Ferry Road, N.W. ◦ Suite 120
Atlanta, Georgia 30339-2927

678.483.0600 ◦ fax: 678.483.0601
1.866.483.DEPO (3376)
www.thompsonreportingatlanta.com

1                    INDEX TO EXAMINATION

2                                              PAGE

3    Cross-Examination by Mr. Ferguson  ............    5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX TO EXHIBITS

2

Defendant's
3       Exhibit No.    Description                          Page

4

5        1             Application for Employment  .....    37

6        2             Letter from Thomas P. DeBerry  ..    41

7        3             Letter from Donald Jones  .......    43

8        4             Application for Employment  .....    50

9        5             Enrollment Application  ........     50

10       6             General Orientation and Training
                       Record  .......................     63
11

         7             Security Officer Handbook  ......    66
12
         8             Memo from Thomas Johnson  .......    68
13
         9             Letter from Derryl Fountain  ....    80
14
         10            Standard Rules and Requirements      95
15
         11            Employee Disciplinary/Corrective
16                     Action Notice  .................     102

17       12            Thread of E-mails  .............     103

18       13            Incident Report  ...............     107

19       14            Memo from Jennifer Turner  ......    111

20       15            Employee Reprimand  ............     113

21       16            Memo from Jennifer Turner  ......    115

22       17            Schedule Offer  ................     153

23       18            Schedule Offer  ................     153

24       19            Schedule Offer  ................     153

25       20            Memo from Donald Jones  ........     158

1           CONTINUED INDEX TO EXHIBITS

2

3    21      Notice of Charge of
             Discrimination  ................  163

4    22      Dismissal and Notice of Rights  .  170

5    23      Notice of Charge of
             Discrimination  ................  172

6

     24      Copies of Pay Stubs  ...........  173

7

     25      Notice of Charge of
8            Discrimination  ................  176

9    26      Dismissal and Notice of Rights  .  198

10   27      Title VII Complaint  ...........  205

11   28      Title VII Complaint  ...........  205

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2        On Behalf of the Plaintiff:

 3            Pro se

 4        On Behalf of the Wackenhut Corporation:

 5            JAMES P. FERGUSON, JR., ATTORNEY AT LAW
              Duane Morris LLP
 6            1180 West Peachtree Street
              Suite 700
 7            Atlanta, Georgia 30309-3448
              (404) 253-6932
 8            Fax (404) 393-1048
              E-mail: jpferguson@duanemorris.com

 9                              - - -

10            [Pursuant to Article 8.B of the Rules and
       Regulations of the Board of Court Reporting of the
11     Judicial Council of Georgia, I make the following
       disclosure:
12
13            I am a Georgia Certified Court Reporter.  I am
       here as a representative of THOMPSON REPORTING
14     SERVICES, INC. THOMPSON REPORTING SERVICES, INC.,
       will not be taking this deposition under any
15     contract that is prohibited by the O.C.G.A. 15-14-37
       (a) and (b).]
16                              - - -

17                        DONALD JONES,

18     being first duly sworn, was examined and deposed as

19     follows:

20                      CROSS-EXAMINATION

21     BY MR. FERGUSON:

22        Q    Please state and spell your full name for the

23     record.

24        A    Donald Jones, D-O-N-A-L-D J-O-N-E-S.

25        Q    And, Mr. Jones, my name is Jay Ferguson, and I
```

1   am one of the attorneys who represents the Wackenhut

2   Corporation in the lawsuit that you filed in the United

3   States District Court for the Northern District of

4   Georgia. And I want to begin by just explaining a few

5   things about the deposition process today.

6           The deposition is taken for purposes of

7   discovery and cross-examination of a witness in

8   accordance with the Federal Rules of Civil Procedure and

9   the Federal Rules of Evidence and for such other

10  purposes as the law may allow.

11          At the end of your deposition, the court

12  reporter will produce a transcript of your testimony.

13  It will come in a little booklet form, and under the

14  Federal Rules, you have the right to review the

15  transcript, or you may waive that right. Do you want to

16  review the transcript, or do you not want to review the

17  transcript?

18      A   Oh, I'll review it.

19      Q   Okay. And I'll be asking you some questions

20  today about the facts concerning your lawsuit against

21  Wackenhut, and you'll be answering my questions under

22  oath. My intent is not to trick you, but it's to find

23  out what you know about your underlying lawsuit against

24  Wackenhut. So if any of my questions are not clear,

25  please let me know, and I'll be happy to repeat it or

1    rephrase the question to make it understandable.  And if

2    you need me to stop and repeat a question, just let me

3    know.  If you don't ask me to repeat or rephrase a

4    question, I'll assume that you understand the questions

5    I have asked.  Is that fair?

6         A    That's fair.

7         Q    And please try today to answer the questions

8    with a yes or a no or another audible answer.  Please

9    don't nod your head or answer with an uh-huh or a uh-uh

10   as that makes it difficult for --

11        A    I've been through this before.

12        Q    Okay.  Okay.  And last kind of ground rule,

13   when I'm asking -- or when you're answering a question,

14   I'll let you fully answer the question --

15        A    Uh-huh.

16        Q    -- before I ask my next question.  And if you

17   could extend the same courtesy, please let me finish my

18   question before you ask -- or before you start answering

19   your question --

20        A    Okay.

21        Q    -- before you start providing your response.

22   And at any time today that you need to take a break,

23   just let me know.

24        A    Oh, no, no problem, just go straight through.

25        Q    Okay.  Are you under the influence of any

1  medication or other substances that might affect your

2  memory or testimony today?

3      A    No.

4      Q    Are you suffering from any conditions that will

5  prevent you from thinking clearly or testifying

6  truthfully today?

7      A    No.

8      Q    Mr. Jones, what did you do to prepare for

9  today's deposition?

10     A    Oh, just basically, I brought some papers

11 because I know there was some type of discrepancy about

12 me being -- having a criminal background.  So I've been

13 a notary for over six years or longer.  And at Wackenhut

14 I was a safety officer, and therefore, we was tested

15 every year.  Therefore, my record is perfectly clear.

16     Q    Okay.  And I see that you brought a packet of

17 stuff with you today.  What -- what is that information?

18     A    Well, this -- one of it is -- is just mainly a

19 notebook that I was going to bring back.  One is the --

20 the suit that I found.  This one here is my notary from

21 2002 (indicating), which I renewed and I still will be a

22 notary up until 2010.  And I think I brought -- no, I

23 didn't.  I thought I had it.  I thought I had my ID that

24 I was a safety officer for Wackenhut.  Oh, is it in

25 here?  Yes, it is.  Here (indicating).

1    Q    So what you handed me, this is your ID badge

2    that --

3    A    That I worked for Wackenhut for a safety

4    officer and we was checked from -- by the FBI every

5    year.

6    Q    Okay.  And you said in preparing for today's

7    deposition you bought some papers; is that --

8    A    No, I just brought -- just the original lawsuit

9    that I had filed.  That's about it.

10    Q    Okay.  Did you do anything else?  Other than

11    reviewing the notary forms and the tracking down your

12    security officer ID badge and reviewing your complaint,

13    did you do anything else in preparing for today's

14    deposition?

15    A    No.  Uh-uh.

16    Q    Did you talk to the deposition -- or talk about

17    the deposition with anyone before coming in today?

18    A    No.

19    Q    And other than those documents you've just

20    showed me, did you review any other documents in

21    preparing for the deposition?

22    A    No.

23    Q    Other than this matter, have you been involved

24    in any other lawsuits?

25    A    Yes.

1    Q    Okay.  How many other lawsuits have you been

2  involved in?

3    A    In Georgia you mean?

4    Q    Well --

5    A    I would say Georgia because we're talking about

6  eight years, so I will go back eight years.  I owned a

7  condo, and I took my -- took them to court because we

8  had generated something like about $800,000.  And I felt

9  that they were stealing the money.  As a matter of fact,

10  there was a group that was there, and we took

11  them -- I took them to court because they wasn't doing

12  repairs on my building.  And that's about it.

13    Q    And you said going back eight years.  So have

14  you lived in Georgia for eight years?

15    A    Unfortunately, yes.

16    Q    Okay.  And the lawsuit that you mentioned with

17  respect to the condo, is that the only lawsuit that

18  you've been involved in since you've lived in Georgia?

19    A    As far -- or as -- I think there was one other

20  one.  I think I took Fulton County Traffic Court to

21  federal court.  They was denying -- and they was denying

22  everybody a jury trial.

23    Q    Right.

24    A    And I took them to court on that.  And then

25  since I won the case, then I was good.

1     Q    Pardon?

2     A    I won the case.  In other words, the ticket was

3  thrown out.

4     Q    Okay.  And that was -- so the second lawsuit

5  you're mentioning -- that you mentioned involved a

6  traffic citation that was issued to you?

7     A    Yeah, it was an accident, you know, and I

8  didn't want all that on my record.  You know, that stays

9  on your record for a long time.

10     Q    Right.

11     A    So the idea was to beat the ticket.

12     Q    Right.  And the first lawsuit that you

13  mentioned involving a condo, you were the plaintiff in

14  that lawsuit?

15     A    That is correct.

16     Q    Were you the only plaintiff in that lawsuit?

17     A    That's correct.

18     Q    Were you represented by an attorney?

19     A    No.

20     Q    And in what court did you file that lawsuit?

21     A    Well, the case started off in small claims

22  court.

23     Q    Uh-huh.

24     A    Whereas that I won it.  And then it was just a

25  bunch of buying the judges from underneath me, and it

1    went to the United States Supreme Court.

2         Q    Okay.  So it went from the Georgia small claims

3    court to the United States Supreme Court?

4         A    That's correct.

5         Q    And in what year was that lawsuit filed?

6         A    I believe in 2002.

7         Q    Was that filed in a particular county in

8    Georgia?

9         A    Just Fulton County.  Fulton County small claims

10   court.

11        Q    Okay.  Fulton County Magistrate Court?

12        A    Uh-huh.

13        Q    Okay.  And how did that matter get resolved?

14        A    Well, the Supreme Court dismissed it.  And as I

15   say now -- and I don't know if I'm going to take it up

16   later, but it was just a bunch of crookedness that's

17   going all the way up to the Supreme Court.

18        Q    And were you paid any money as a result of that

19   lawsuit?

20        A    No.

21        Q    Did one -- did a Georgia judge dismiss that

22   lawsuit?

23        A    There was Judge -- oh, I can't think what her

24   name was.  She was demoted.  She was sent down to the

25   family courts because what she was doing she was what

they call, quote, a sharpen judge, unquote.

And I had took out a order of protection against the -- the condo. I won a temporary one. Then they took it, and Judge Shoops [sic] -- Shoops, S-H-O-O-P, I think that was her name -- and then after she dropped the order of protection, she involved herself in the original suit, which she didn't have any right to do. So that's how we got into the Court of Appeals to Georgia Supreme Court and to the United States Supreme Court.

Q  What did the Georgia Court of Appeals do with the case?

A  They totally just -- they ignored all the facts in the case, literally.

Q  Did they affirm the dismissal that the judge entered?

A  Right, they -- what they did is they just ignored they own rules.

Q  What was the name of the defendant in that lawsuit?

A  Shannon Villa.

Q  Could you spell that, please?

A  No.  That was the name of the condos that I had lived in.  Shannon Villa.  I don't -- I don't know.

Q  Is that two words?

1    A    Uh-huh.

2    Q    S-H-A-N-N-O-N?

3    A    And Villa.

4    Q    And Villa?

5    A    Uh-huh.

6    Q    Where are those condos located?

7    A    That's in Union City.

8    Q    And does that condo complex have a lot of

9 residents?

10    A    Yes, it was a very large condominium.

11    Q    And you were one of many residents at that

12 condo?

13    A    That's correct.

14    Q    And other than the lawsuit involving the condo

15 and the lawsuit -- or the traffic ticket --

16    A    Uh-huh.

17    Q    -- incident, are there any other lawsuits that

18 you've been involved in other than this Wackenhut

19 lawsuit since you've lived in Georgia?

20    A    No.

21    Q    How about -- before Georgia, you lived in New

22 York?

23    A    That's correct.

24    Q    Where did you live in New York?

25    A    Brooklyn, born and raised.

1  Q  Were you for the Giants last night?

2  A  Oh, definitely.

3  Q  How many lawsuits were you involved in while

4 you lived in the state of New York?

5  A  I don't think I should go back that far. I

6 don't think it's necessary for me to go back that far.

7  Q  Well, it's -- the Federal Rules of Civil

8 Procedure have -- Rule 26 of the Federal Rules has a

9 very broad discovery parameter.

10  A  Uh-huh.

11  Q  And I understand you may think that some of the

12 questions that I'm asking today aren't relevant, but I'm

13 still allowed to ask the questions.

14  A  Okay.

15  Q  We're not going to spend a whole lot of time

16 discussing them, and they may or may not have relevance

17 that would be -- they may or may -- my questions may or

18 may not produce facts that may eventually be relevant at

19 trial, but I think I'm still entitled to ask the

20 questions.

21  A  Okay. I disagree with you.

22  Q  Okay. So I'll ask it again: How many lawsuits

23 were you involved in when you were a resident of the

24 state of New York?

25  A  I disagree with that question.

1    Q    So is that --

2    A    No.  That's a no.  I think that's -- I feel

3    that that's going back too far, way too far.

4    Q    Okay.  Let -- and let me ask:  Are you refusing

5    to answer my question about prior lawsuits in which you

6    have been involved?

7    A    No.  I'm saying I'm -- what I feel, that going

8    back my entire life is going back too far.  I think --

9    feel strongly that eight years here in Georgia is --

10   is -- that's even too far.

11          I believe that I submitted some statements to

12   you on the -- with the discovery, and you only allowed

13   me three years going back.  But I will allow you to go

14   back the whole eight years that I lived in Georgia, but

15   I don't -- I think that is more of a witch-hunt going

16   back your entire lifetime.

17   Q    So are you refusing to answer my questions

18   about --

19   A    New York City, that's correct.

20   Q    So you're refusing about --

21   A    Yes, I think that --

22   Q    Mr. Jones, please --

23   A    Yeah.

24   Q    Please let me finish my --

25   A    Uh-huh.

1      Q    -- questions, and I'll allow you enough time to

2  answer.

3      A    Uh-huh.

4      Q    I just want to make sure we have a clean record

5  of this.

6      A    Okay.

7      Q    Are you refusing my -- refusing to answer my

8  questions about lawsuits that you filed or were involved

9  in when you were a resident of the state of New York?

10     A    That's correct.  I considered it a witch-hunt.

11  I consider going -- you know, there's no merit to it.

12     Q    And I remember at one point you told me that

13  you filed a lawsuit on behalf of your fiancee.  Was that

14  a lawsuit from -- or that was filed when you were in the

15  state of New York?

16     A    That's correct.

17     Q    So --

18     A    It was all -- it was already in the court.

19  What I did was I took it over.  But then, again, that's

20  in New York City.

21     Q    And because it's in New York City, you're not

22  willing to answer questions about that lawsuit today?

23     A    Right.  I don't believe it has any merit.  And

24  that was my wife, common law wife.  We believe in common

25  law in New York.

1      Q    Have you ever been deposed before?

2      A    What do you mean deposed?

3      Q    Today you're sitting for your deposition.

4      A    Uh-huh.

5      Q    And I'm conducting your deposition.  Have

6  you -- in any cases in which you've been involved

7  before, have you ever had your deposition taken before?

8      A    I think that's -- not while -- not as long as

9  I've been in Georgia, no.

10     Q    Have you had your deposition taken in any other

11 states?

12     A    I'm not going to answer that.  Because like I

13 said, I'm -- I'm going to go back as far as eight years,

14 and that's it.

15     Q    So since you've lived in Georgia, you have not

16 participated in -- or you have not had your deposition

17 taken with respect to any lawsuit; is that correct?

18     A    That's correct.

19     Q    Have you ever filed an EEOC charge against any

20 other employer other than Wackenhut?

21     A    In Georgia?

22     Q    In general.  Well, yeah, let's start with

23 Georgia.

24     A    Uh-huh.

25     Q    Have you filed an EEOC charge against any

1  employer other than Wackenhut in the state of Georgia?
2      A    Yes.
3      Q    Who was that?
4      A    Arko.
5      Q    And Arko, that's a security company?
6      A    Right. But they no longer exist.
7      Q    Okay. Other than the Arko EEOC charge, have
8  you filed any other EEOC charges?
9      A    Yes. Let me see. I can't -- wait. Let me get
10 my wallet out. KSI and Thorpe.
11     Q    And what was the last one?
12     A    Thorpe.
13     Q    Could you spell that, please.
14     A    T-H-O-R-P-E.
15     Q    And did you work for all three of those
16 companies in the state of Georgia?
17     A    That's correct.
18     Q    And other than Arko, KSI, and Thorpe, have you
19 filed any other EEOC charges against any other
20 employees?
21     A    Those are the only companies that I worked for
22 here in Georgia.
23     Q    Okay. When you lived in New York, did you file
24 any EEOC charges against any employers?
25     A    I'm not going to go back that far.

1    Q    When did you file the EEOC charge against Arko?

2    A    I don't know.  When I worked for them was --

3    could have been in 2001.

4    Q    And correct me if I'm wrong, but Arko, that

5    is -- that's a security guarding company?

6    A    It used to be.  They sold out.

7    Q    And that was the -- was that the company you

8    were employed with just before you began your employment

9    with Wackenhut?

10    A    Let me see.  Yes.

11    Q    And did you file your charge against Arko

12    during or after you were employed with Arko?

13    A    I filed it while I was employed with Arko.  And

14    I was still employed with Arko for, I believe, over a

15    year after the fact.

16    Q    Okay.  And what -- what did you allege in your

17    charge?

18    A    Racism.

19    Q    And what else did you allege in that charge?

20    A    It was age discrimination.  That's what it was.

21    And it was won.

22    Q    Just one charge?

23    A    No, I said I won it.

24    Q    Okay.  So in that charge you alleged race

25    discrimination and age discrimination?

1      A     Age discrimination.  It was basically on age

2   discrimination.

3      Q     Okay.  Was race discrimination part of that

4   charge?

5      A     I don't know off the hand, but I know age

6   discrimination was.

7      Q     And you said you -- you won that charge?

8      A     Right.  We went to the mediator, and I got

9   signed papers to the fact.  And they agreed to cure

10  they -- they ways, and they did.

11     Q     And what -- when you say they agreed to cure

12  their ways, what did they do -- what steps did they take

13  to cure those ways?

14     A     Well, there was no more harassment, because

15  there was harassment.  They had a person that working at

16  one of they banks.  I think it was SunTrust.  Right.

17  And they wanted to get rid of this employee because he

18  wasn't a full-time worker.  He was a part-time worker

19  because he was collecting his Social Security.  But bank

20  managers stood up and -- stood up for this guy.

21         So now they had me.  So they didn't know what

22  to do with me.  So they -- they point was to get rid of

23  me.  The person that was involved, of course, he was

24  over 65.  I was in 60 plus, so I -- I brought those

25  charges up against them.  And they agreed to it.  They

1   admitted it, that that's what they were doing.  And then

2   they said that they would cure their ways.

3       Q.  Did you receive any -- any money --

4       A   No.

5       Q   -- as a result of that charge?

6       A   It wasn't about money.  It was more about

7   respect.

8       Q   Did you have an attorney representing you?

9       A   No.

10      Q   How about the -- the EEOC charge that you filed

11  against KSI?

12      A   Well, KSI, it was armed security post.  We was

13  there guarding the condominiums there.  Of course, we

14  have to deal with drug dealers, and the drug dealers

15  wasn't too happy with me.  So they made up a false

16  charge of child melatation (phonetic).  They said I

17  was -- and which wasn't founded, because when I went and

18  applied for unemployment, they investigated and they

19  found out that it wasn't founded.

20      Q   And what type of company is KSI?

21      A   Same thing, security.

22      Q   And were you employed with KSI before or after

23  Arko?

24      A   After Arko.

25      Q   Were you employed with KSI before or after

1  Wackenhut?

2      A    After Wackenhut.

3      Q    After Wackenhut.  When you left Wackenhut --

4      A    I went to KSI.

5      Q    So you left Wackenhut to go to KSI?

6      A    Uh-huh.

7      Q    Okay.  And what -- what type of -- what did you

8  allege in your charge against KSI?

9      A    I just -- I know I just denied the charges, and

10  the unemployment people, they investigated, I think,

11  also with the EEOC with it.  And they just found that

12  they charges wasn't founded.

13      Q    Well, and let me -- let me rephrase my

14  question.  In the charge of -- you filed an EEOC charge

15  against KSI?

16      A    Uh-huh.

17      Q    Did you allege age discrimination in that

18  charge?

19      A    I don't remember.  I don't remember whether it

20  was age discrimination.  I do know that I had just went

21  up there and said that they had fired me without just

22  cause.

23      Q    So you alleged some sort of discrimination in

24  that charge?

25      A    It has to be.

1     Q    And did you -- how was that charge resolved?

2     A    The same as Wackenhut, they didn't find them

3    guilty.  They didn't find me guilty.  But the

4    unemployment, they had investigated, and they found that

5    it wasn't credible -- that the charges wasn't founded.

6     Q    That's the Georgia Department of Labor?

7     A    Uh-huh.

8     Q    And sticking with KSI, did you receive any

9    money as a result of filing that charge?

10     A    It had nothing to do with money.  No.  It

11    had -- what it has to do with, both with Arko and KSI,

12    is to protect my employment records, you know.  You

13    get -- you get fired or something like that, it's going

14    to be hard for you to get rehired.  So what I do is --

15    as a black person -- of course, the EEOC is a civil

16    rights organization by Congress, and it protects my

17    employment record.  And that's what I'm doing.

18     Q    So is that a -- is the answer to my question,

19    no, you did not receive any money as a result of filing

20    the KSI --

21     A    No, it had nothing to do with money, just a

22    matter of just -- of protecting my employment.

23     Q    Did you have an attorney representing you

24    against KSI?

25     A    No.

1     Q    Did you file that KSI charge during or after

2  you were employed with KSI?

3     A    When I got fired, I went down there, and I

4  filed it.

5     Q    So it was a wrongful termination charge?

6     A    That's correct.

7     Q    Okay.

8     A    And that was to protect my employment record.

9     Q    Do you remember when -- approximately when you

10  filed that charge?

11     A    No, not offhand.  No.

12     Q    When did you -- okay.  I'll come back.  I'll

13  have some other questions later about your dates of

14  employment with KSI.

15     A    Uh-huh.  It was only for about five months.  It

16  wasn't long.

17     Q    Okay.  When did you -- because you left

18  Wackenhut, I believe, August of 2006?

19     A    Uh-huh.

20     Q    When did you start with KSI?

21     A    Maybe about three weeks after I left Wackenhut.

22     Q    Would you like some water?

23     A    No, I'm okay.

24     Q    So you started at KSI approximately three weeks

25  after Wackenhut, and you said you were employed with

1  them for four or five months?

2      A    Correct.

3      Q    And you mentioned filing an EEOC charge against

4  Thorpe?

5      A    Yeah, well, I can't go into that because that's

6  being investigated.  As of now, that's being

7  investigated.

8      Q    So you have a current charge that's pending --

9  a current EEOC charge that's pending against Thorpe?

10     A    That's correct.

11     Q    Are you currently employed with Thorpe?

12     A    That's correct.

13     Q    And when you left KSI, was Thorpe your next

14  employer?

15     A    Yes.

16     Q    And do you allege that Thorpe has discriminated

17  against you?

18     A    That's correct.  There's no doubt about it.

19          We are in the state of Georgia.  The state of

20  Georgia is a very racist state, something I didn't know

21  about.  But the difference between, you can say, the

22  blacks here in Georgia and in New York, that the blacks

23  here, when something happens, they just walk away.  You

24  know, they don't -- they don't fight nothing.  They

25  don't do anything.

1    So basically, the southern whites they just

2  have their own way.  They just do whatever they want to

3  do, and that's the way they do it.

4    My position is I got a history of employment,

5  and I got to protect it.  And I use -- I don't use

6  baseball bats.  I use the law.

7    Q    And what do you allege that Thorpe has done

8  that's discriminatory?

9    A    I can't discuss that because it's being

10  investigated.

11    Q    So are you saying that you --

12    MR. FERGUSON:  If we could go off the

13    record for one second.

14    (Brief interruption.)

15  BY MR. FERGUSON:

16    Q    And, Mr. Jones, we were just discussing the

17  EEOC charge that you filed against Thorpe, and am I

18  correct that you are refusing to answer any additional

19  questions --

20    A    That's correct.  It's --

21    Q    And please let me finish my --

22    A    Go ahead.

23    Q    Am I correct that you are refusing to answer

24  any other questions about your EEOC charge against

25  Thorpe because that is a -- that charge is currently

1  pending with the EEOC?

2      A    That's right.  They're investigating it as of

3  now.

4      Q    Did you have an attorney representing you

5  during that process?

6      A    No.

7      Q    In the state of Georgia, have you filed any

8  other EEOC charges against other employers other than

9  Arko, KSI, Wackenhut, and Thorpe?

10      A    Those are the people that I worked for, no.

11      Q    Okay.  So is it safe to say that since you

12  lived in Georgia, you filed EEOC charges against your

13  last four employers?

14      A    That's correct.  They seem to be like -- they

15  have a very poor opinion towards blacks, it seems like,

16  in this state.

17      Q    You're just talking about employers in general?

18      A    Yeah.  Well, the state of Georgia basically is

19  a racist state, very highly racist.

20      Q    And how about -- I think I've already asked

21  this, but I want to make -- if I haven't, I want to make

22  it clear.  When you lived in the state of New York, did

23  you file any EEOC charges against any employers up

24  there?

25      A    I won't go back that far.  I think that's more

1  of a witch-hunt.

2      Q    What is your date of birth?

3      A    May 21st, 1942.

4      Q    And what is your home address?

5      A    45550 Washington Road, Union -- no.  No.

6  College Park 30272.  However, I use my -- of course, you

7  know I use a box office.

8      Q    A P.O. Box?

9      A    Right.

10     Q    And how long have you resided at that

11 residence?

12     A    I believe two years.

13     Q    And where did you reside before that?

14     A    Shannon Villa.

15     Q    That's the condo complex --

16     A    Right.

17     Q    -- that we've already talked about?

18     A    That's the place I owned.  I let it go into

19 foreclosure like millions of other people.

20     Q    And how long did you reside there?

21     A    I believe about three years.

22     Q    What is your telephone number?

23     A    (678) 360-1505.

24     Q    Are you married?

25     A    No.

1     Q    Have you ever been married?

2     A    Yes.

3     Q    How many times?

4     A    Well, I don't think that has anything to do

5 with it, but I will tell you. Three times.

6     Q    And did each of those marriages end in divorce?

7     A    Yes.

8     Q    And were those three marriages, were those

9 marriages from when you were living in the state of New

10 York?

11     A    No. I had -- my second marriage was a common

12 law marriage, and -- but Georgia does not recognize

13 common law marriages. So it wasn't a -- that wasn't a

14 divorce. And my third marriage was here in Georgia,

15 yes.

16     Q    So the first two marriages were from when you

17 lived in New York?

18     A    That's correct.

19     Q    And the second of those two New York marriages

20 was a common law marriage?

21     A    The second one, yes.

22     Q    And the third marriage --

23     A    Was here in Georgia.

24     Q    In Georgia. And that ended in divorce?

25     A    That's correct.

```
 1      Q    When -- when did you get a divorce in Georgia?
 2      A    Oh, I don't remember.  The marriage didn't last
 3    long.  It didn't last a year.
 4      Q    What was your wife's name?
 5      A    Mona.
 6      Q    What was Mona's last name?
 7      A    Oh, I don't know offhand.
 8      Q    And in what court did you and Mona seek --
 9      A    Fulton --
10      Q    -- divorce?
11      A    Fulton County.
12      Q    Were either of you represented by an attorney
13    in that process?
14      A    No.
15      Q    When did you and Mona get divorced?
16      A    Oh, I don't know offhand.
17      Q    Was that in -- would you say it's in the
18    last -- within the last two years?
19      A    No, I would say in the last three years.
20      Q    Within the last three years?
21      A    Uh-huh.
22      Q    And that was a divorce petition filed in the
23    Fulton County Superior Court system?
24      A    That's correct.
25      Q    Do you have any children?
```

1     A     Two -- two children, one deceased, and one

2 stepdaughter.

3     Q     Two children, one of whom is deceased?

4     A     No, I have two living children, natural

5 children, one -- and my third daughter, she's deceased,

6 and I have stepchildren.

7     Q     And where do your two children live?

8     A     New York.

9     Q     How about your stepchildren?

10     A     Pennsylvania and one lives here in Georgia.

11     Q     Just one stepchild in Georgia?

12     A     Uh-huh.

13     Q     Where in Georgia does --

14     A     Lawrenceville.

15     Q     And what is that person's name?

16     A     Ming.

17     Q     May?

18     A     Ming.

19     Q     How do you spell that?

20     A     Oh, I don't know.  She was Vietnamese, so I

21 don't know how to spell their names.

22     Q     So M-I-N-G?

23     A     Something like that.  And the daughter's name

24 is Lan, L-A-N, and her name is Sung Lee.

25     Q     The -- whose name is Sung Lee?

1    A    That was my wife.

2    Q    And was that your third wife?

3    A    Second.

4    Q    Was that a common -- was that the common law

5  wife?

6    A    That's correct.

7    Q    So your common law wife from New York -- former

8  common law wife has a daughter who lives in

9  Lawrenceville; is that correct?

10    A    She has a son that lives in Lawrenceville, and

11  her daughter lives in Pennsylvania.

12    Q    Okay.  What is the son's name that lives in

13  Lawrenceville?

14    A    Ming, I believe.

15    Q    Other than Ming who lives in Lawrenceville, do

16  you have any other children or stepchildren that reside

17  in the state of Georgia?

18    A    No.

19    Q    And let's discuss your educational background.

20  Did you start high school in 1956?

21    A    I graduated from high school, and I have one

22  year of business school in PSI Institution.

23    Q    Okay.

24    A    For computer programming.

25    Q    Okay.  But did you start high school in 1956?

1    Does that sound right?

2        A    I guess so.

3        Q    When did you graduate from high school, what

4    year?

5        A    Oh, I don't know what year.  That's going back

6    too far.

7        Q    Did you -- did you leave high school during

8    your senior year before graduating and then go back at

9    some other point to get a high school degree?

10       A    No.

11       Q    So did you go straight through from freshman

12   year through senior year and get a diploma?

13       A    Yes.

14       Q    What was the name of your high school?

15       A    Alexander Hamilton.

16       Q    And in what city is that school?

17       A    Brooklyn, New York.

18       Q  . If I've seen documents that say that you

19   graduated from high school in 1960, does that sound

20   right to you?

21       A    It could have been.

22       Q    Is that the approximate year that you

23   graduated?

24       A    1960.  Let's see.  Fifty, that would be 18.

25   Right.

1    Q    You were born in 1942?

2    A    That's correct.

3    Q    And you mentioned another degree other than

4  your high school degree.

5    A    Yes.  PSI, Programming System Institute.  It

6  was a programming course that I was a computer

7  programmer.

8    Q    And PSI, was that the name of the school?

9    A    Programming System Institute.

10    Q    Where is PSI located?

11    A    New York.

12    Q    And was that a degree or was that a certificate

13  that you obtained from them?

14    A    A degree, I believe.

15    Q    How long did it take you to get that degree?

16    A    A year.

17    Q    Did you -- did you attend college?

18    A    Outside of that, that was it.

19    Q    Other than PSI?

20    A    No.

21    Q    And what type of programming course did PSI

22  offer?  Was that computer programming?

23    A    Right, that's what it was, computer

24  programming.  It was a IB -- it was -- it was the IBM.

25  I can't think of the language that they had.

```
1        Q    In what year did you obtain that?

2        A    Oh, I don't know. I had it -- I got it on my

3   resume, but I don't know what year it was.

4        Q    That was -- but that was before you moved to

5   the state of Georgia?

6        A    Oh, yes.

7        Q    And other than the high school degree and the

8   PSI degree, have you obtained any other educational

9   degrees?

10       A    No.

11       Q    Have you ever served in the military?

12       A    No.

13       Q    And other than Wackenhut and you mentioned Arko

14  and I believe also Thorpe, have you had any other jobs

15  in the security industry?

16       A    No.

17       Q    So your jobs in the security industry are --

18       A    It's all right here in Georgia.

19       Q    Okay.  So when you lived in the state of New

20  York, you were not a security guard up there?

21       A    No.

22       Q    And Arko, was that the first security job that

23  you had ever?

24       A    Right.  It was working in SunTrust Bank, armed

25  security.
```

1    Q    Now, when you say working at SunTrust Bank, was

2    that -- were you an Arko employee on assignment at --

3    A    SunTrust Bank, right, in Union City.

4    Q    And that was a SunTrust branch office?

5    A    No, it's a bank.

6    Q    Okay.  So that was a SunTrust --

7    A    Bank.

8    Q    -- branch bank?

9    A    Right.

10    Q    What were your dates of employment at Arko?

11    A    I don't know offhand.  I believe -- I can say

12    maybe from 2000 to 2003 or 2004.  They lost the -- they

13    didn't lose the entire SunTrust contract, but they

14    did -- they did remove all the bank security guards from

15    out of they banks.  So that's when I went to Wackenhut.

16         MR. FERGUSON:  If we could mark this as

17         Exhibit 1, please.

18         (Defendant's Exhibit No. 1 was marked.)

19    BY MR. FERGUSON:

20    Q    Mr. Jones, I've handed you what we've marked as

21    Exhibit 1.  Have you seen this document before?

22    A    That's my handwriting, I know that.  Yeah.

23    Yes, I have.  I believe I'm the one -- I made this out.

24    It looks like my handwriting.

25    Q    Was this your Arko job application?

Q    When did you leave Arko?

A    Oh, I don't know, when I joined Wackenhut.

Q    So my records reflect that you joined Wackenhut in February 2003.

A    And that's -- then that's when I left Arko.

Q    Why did you leave Arko?

A    I stated that.  They lost they branch contract.

Q    So that was -- you left Arko because they lost their contract with SunTrust?

A    They didn't lose the entire contract.  They just lost they -- they branch contract.  In other words, they had armed security in all they branches, and they discontinued them.

Q    And on this application that I've handed you that we've marked as Exhibit 1, that is your handwriting on this exhibit?

A    Looks like it.

Q    And I don't want to go through your entire work history, so let me ask just a summary question.  On page 2 of this exhibit --

A    Uh-huh.

Q    -- does that accurately reflect your work history before Arko?

A    I would go as far as RPS, which is in Atlanta, Georgia.  I'm not going to go as -- back to any

1    employment before that.

2        Q    Now, let me make sure I understand correctly --

3    correctly.  You will not answer any questions about

4    places where you worked in the -- in the state of New

5    York?

6        A    That's correct.

7        Q    What year did you move to Atlanta?

8        A    I believe it was around November 1999.

9        Q    Okay.  And then if you look on this exhibit, I

10   see that it looks like you started with RPS --

11       A    Yeah, that was a part-time job.  I just -- I

12   had enough funds to -- to set myself up, and then I just

13   took that as a part-time job.

14       Q    And so RPS was your first job in Atlanta?

15       A    Right.  It was a packing job.

16       Q    And you started there in November of '99 when

17   you moved here?

18       A    Right.

19       Q    What is RPS?  What does that stand for?

20       A    It's like a United Parcel, like that.  You

21   know, they deliver mail, boxes, and stuff.

22       Q    A delivery company?

23       A    Yeah.

24       Q    Where are they located?

25       A    Atlanta Industrial Park.

1     Q    And why did you leave RPS?

2     A    To get a full-time job.

3     Q    And that was to accept a full-time job at Arko?

4     A    That's correct.

5     Q    Okay.  I have no more questions about that

6 exhibit.

7     A    Uh-huh.

8     MR. FERGUSON:  If you could mark that as

9     Exhibit 2, please.

10     (Defendant's Exhibit No. 2 was marked.)

11 BY MR. FERGUSON:

12     Q    Let me back up to -- to Arko.  What was the

13 name of your supervisor at Arko?

14     A    Oh, I don't know.  I couldn't tell you offhand.

15     Q    Was the SunTrust guarding assignment, was that

16 the only guarding assignment that you worked on for

17 Arko?

18     A    I did overtime in downtown.  They have, like,

19 a -- a parking deck behind the SunTrust Bank downtown,

20 you know, where the park is down there, and they have a

21 parking deck back there.  I did overtime back there, and

22 then that was about it.

23     Q    And that was a guarding assignment for SunTrust

24 but just at a different location?

25     A    That's correct.

1    Q    Let me hand you what we've marked as Exhibit 2.
2  Have you seen this document before?

3    A    Not offhand, not that I remember.

4    Q    Who is Thomas DeBerry?

5    A    Oh, this guy here, he's a waste of money.  He
6  was a shyster.

7    Q    Is he an attorney?

8    A    Yeah, if -- if -- I guess so.  That's when they
9  was harassing me, and I asked him, you know, maybe to --
10  in order to get an attorney to send him a letter saying
11  that he -- is this it?  To represent me, maybe they
12  would back them off.  But, you know, this guy here, he
13  was just a -- he was just a shyster.

14    Q    So that's an attorney that you hired?

15    A    I gave him, I think -- how much did I give him?
16  Maybe a hundred dollars or something.  It was just
17  basically to write the letter.  Right.  And then
18  maybe -- you know, in order to slow them down because
19  they was really getting ridiculous in what they was
20  doing.

21    Q    And the letter references an EEO settlement and
22  retaliation also, and I think you previously testified
23  you brought a charge of discrimination against Arko?

24    A    Uh-huh.

25    Q    Is that what he's referring to there?

1    A    That's what he's referring to, yeah.

2    Q    And did you also testify that you didn't

3  receive any money from Arko as a result of a settlement?

4  Is that right?

5    A    Not that I know of, no.  In other words, if --

6  if they did, it was back pay.  But I don't remember

7  getting any money from them.

8    Q    And actually, I brought copies --

9    A    Uh-huh.

10    Q    -- extra copies of all the exhibits for you

11  today, so you can -- you can keep all of these as well.

12  And I have no more questions about Exhibit 2.

13          MR. FERGUSON:  Mark that as Exhibit 3,

14          please.

15          (Defendant's Exhibit No. 3 was marked.)

16  BY MR. FERGUSON:

17    Q    Mr. Jones, I've handed you a copy of what we've

18  marked as Defendant's Exhibit 3.

19    A    Which one?

20    Q    Exhibit 3.

21    A    This here, probably, yeah.  If I have to pick

22  somebody up at the airport, then Vernon [sic] Bowie,

23  that's who he was.

24    Q    And is that your signature appearing on the

25  first page of this exhibit?

A    That's correct.

Q    Who is Velton Bowie?

A    He's the supervisor who you wanted to know.

Q    So he was your Arko supervisor?

A    That's correct.

Q    So is this -- this is a note that you submitted to your supervisor at Arko?

A    Yeah. Well, if you're going to take a day off, that's what you have to do. You got to put it in writing, or change a date or for whatever.

Q    And in the last sentence of this letter, you state that I am asking for the midnight shift because of the drug problem I spoke to you earlier about. What are you referencing there?

A    I really don't know.

Q    Was that a drug problem that you had?

A    No, I don't have a drug problem.

Q    Was that a drug problem that a family member had?

A    No. I don't know what that was all about. I really can't remember. It's too far away.

Q    And the sentence before that --

A    It was probably a drug problem that they was having with the company, in that company, because everybody is given a drug test.

1    Q    But it didn't involve you?

2    A    No.

3    Q    The sentence before that you reference a court

4  date, and you attach a copy of the court notice, which I

5  believe is exhibit -- which I believe is page 2 of this

6  exhibit?

7    A    Right.

8    Q    Is that a true and accurate copy of the court

9  notice that you provided to Velton Bowie?

10    A    It must be, yeah.

11    Q    Okay.  And what did that arbitration involve?

12    A    If it says State of North Carolina, that has to

13  do with a car.

14    Q    Was that your car?

15    A    Yes.  I bought a car there, and it had a

16  transmission problem.

17    Q    That doesn't sound fun.  Now, was that a car

18  that you bought from Michael's Auto Sales?

19    A    That's correct.

20    Q    And was that a -- did you file a lawsuit

21  against Michael's Auto Sales because it had a bad

22  transmission?

23    A    Yes, it was based on the fact that the

24  transmission got out.  I think it cost me about $2,000

25  to get it fixed, and it was under the Lemon Law.

Q    How -- or how was that case resolved?

A    North Carolina -- let me make sure I said right.  Yeah, North Carolina is the same as Georgia.  It's -- it's all a rigged set up court.

Q    So did you receive any money from --

A    Nothing.

Q    -- Michael's Auto Sales?

A    No, it was under the Lemon Law, but everything was just like they do here in Georgia.  Everything is rigged.  It's nothing that's fair down there.  It's not what you know, it's who you know.

Q    And I have no more questions on that.

And you mentioned that in your opinion KSI wrongfully terminated you; is that right?

A    That's correct.

Q    Other than KSI, have you ever been fired by any other employers?

A    Not in Georgia, no.

Q    How about in New York?

A    I won't mention New York.  I think that's -- like I said, that's a witch-hunt.  That's going back too far.

Q    So you're refusing -- just I want to make sure we have a clear record of this.  You're refusing to discuss involuntary terminations that you've encountered

1    from employers in the state of New York?

2         A    I'm not stating that I ever been terminated

3    from any company.  I'm saying that going back more than

4    eight years is -- is -- is unacceptable.

5         Q    Why were you terminated by KSI?

6         A    I was putting too much pressure on a drug

7    dealer.

8         Q    What do you mean by that?

9         A    One of his henchmen told me how to do my job,

10   and it wasn't going to happen.  They have the rules

11   there where you're not supposed to be drinking outside

12   the building, and what we did was we patrolled the

13   complex.  If they was drinking or standing outside, we

14   had them go inside.

15            This particular drug dealer, he got aggressive.

16   He came at me with a beer bottle.  I drew my gun,

17   ordered him to put it down.  He did.  And, of course, I

18   have to call the police and have them come in, because

19   any time we draw our weapon that's what we got to do.

20   And next thing I know, they made up these false charges

21   about me.

22        Q    And were you -- at KSI were you on a guarding

23   assignment at some --

24        A    A complex, yes.

25        Q    A condo complex?

1       A       Uh-huh.  Yes.

2       Q       What was the name of that condo complex?

3       A       Oh, I don't know.  It's on Bracket Street.

4    Bracket Street.  It was right across the street from

5    that -- that known disco Strokers in Stone Mountain.

6       Q       Okay.  And at the condo complex during your

7    assignment, you had to draw your gun on one occasion?

8       A       That's correct.

9       Q       Okay.  And you were fired shortly after that?

10      A       Yes.

11      Q       What is -- where is KSI headquartered?

12      A       It's downtown.  I know where the building is,

13   but I don't know the address of it.

14      Q       Downtown Atlanta?

15      A       Wait a minute.  Let me see.  75 Piermont [sic]

16   Avenue, Suite 368.

17      Q       Is that Piedmont Avenue?

18      A       Oh, Piedmont Avenue, yeah.

19      Q       How do you spell that?

20      A       (Indicating).

21      Q       Okay.  Piedmont Avenue, Suite 368.  And I see a

22   name Ronald Bonner on here.  Was he -- was he your

23   supervisor there?

24      A       Yeah, he's one of the supervisors.  I don't

25   know if they there.  They lost a awful lot.  Even if

1   they still in business, they lost -- from what I heard

2   from my other colleagues who worked there, they lost a

3   lot of, lot of contracts.

4      Q    RSI did?

5      A    Yeah, a lot.

6      Q    Or KSI, I should say?

7      A    Yeah, they just about going out of business.

8   They lost a lot of contracts.

9      Q    And I'm just going to note for the record the

10  telephone number of KSI is (404) 521-1507. Does that

11  sound right?

12     A    Whatever is on there.

13     Q    Okay.  Was -- was Mr. Bonner your direct

14  supervisor?

15     A    He was one of the supervisors there.  He wasn't

16  the owner.  I guess what it says on here, he's the

17  operating manager.  Then at each store you had a

18  supervisor or a manager.

19     Q    And who was your manager at the apartment -- at

20  the condo complex?

21     A    Oh, they vary because they -- they didn't --

22  nobody stayed long.

23     Q    So just a lot of turnover there?

24     A    Uh-huh.

25     Q    And I believe we've covered this already, but

1    you began working for Wackenhut in February 2003.  Does

2    that sound right?

3        A    Whenever I left Arko, I went to Wackenhut.  I

4    crossed over same time.

5        Q    Okay.  Did you have any reason to believe

6    that -- well, I'll show you your Wackenhut employment

7    application --

8        A    Uh-huh.

9        Q    -- which why don't we go ahead and do that now.

10           (Defendant's Exhibit No. 4 was marked.)

11   BY MR. FERGUSON:

12       Q    Mr. Jones, I've handed you a copy of what we've

13   marked as Exhibit 4.  Have you seen this document

14   before?

15       A    It looks like my handwriting.

16       Q    And is this your Wackenhut job application?

17       A    It looks like it.

18       Q    Is that your signature appearing at the bottom

19   of page 3?

20       A    That's correct.

21       Q    Okay.

22           (Defendant's Exhibit No. 5 was marked.)

23   BY MR. FERGUSON:

24       Q    Mr. Jones, I've handed you what's been marked

25   as Exhibit 5.  Have you seen this document before?