# EXHIBIT B
# PART II

Jones v. Wackenhut &#38;#38;#38; Google Inc.   Doc. 76 Att. 4

Dockets.Justia.com

1     A    Not that I can remember.

2     Q    Is that your signature appearing at the bottom

3 of Exhibit 5?

4     A    Yes, it is.

5     Q    What is this document?

6     A    I couldn't tell you.

7     Q    To me this looks like this was a document that

8 was provided to you during the open -- the benefits open

9 enrollment period.  Does that look familiar?

10    A    It could be.  I don't remember.

11    Q    And I see under the -- let me point to it.

12 This section, I'm pointing to the Starbridge Enrollment

13 Information Section.  Starbridge, was that the name of

14 the company that offered insurance benefits?

15    A    I don't take insurance from companies.  I never

16 get involved in -- with they -- with they insurance.

17    Q    Because I see at the bottom --

18    A    Right.

19    Q    -- of this exhibit --

20    A    Uh-huh.

21    Q    -- it says declined.

22    A    Right.

23    Q    So did you -- or when you were employed at

24 Wackenhut, did you decline health insurance, life

25 insurance, dental insurance?

1      A      I probably did.  That's common with me.  I

2  never accept those things.

3      Q      So you -- no matter where you're employed, you

4  always decline those benefits?

5      A      Right.  That's correct.

6      Q      Do you recall whether you ever had health

7  insurance, life insurance or dental insurance with

8  Wackenhut?

9      A      No, I can -- I don't remember, but I can say

10  according to how I do things I decline them.  I don't

11  take them.

12      Q      And I'm going to back up to the Wackenhut job

13  application.  At the bottom of page 1 there, in Section

14  15, you note that you've been -- that you were convicted

15  of a crime.  Do you see that?

16      A      I was convicted of a crime?  No, I never was

17  convicted of no crime.  If I was convicted of a crime, I

18  couldn't have a -- a gun license.

19      Q      Okay.  Well, if you could look then at

20  Section 15, the question is asked:  Have you ever been

21  convicted for the violation of any law in a military or

22  criminal court which has not be sealed, annulled or

23  deleted from the record.  And there's a yes and a no

24  box, and you have both boxes checked there.  And

25  directly beneath that, you list Union City as the

1    location and a date when that occurred.  What -- if you

2    could just explain to me what you were disclosing there.

3        A    I can see something here that says a stop

4    signal.  That's a traffic thing.  That's not a crime.

5        Q    Okay.  So that's what you were disclosing, this

6    was a -- you were disclosing a traffic citation?

7        A    Right.

8        Q    Is that what that -- this says type of

9    conviction, and I can't read it.  It says stop --

10       A    Stop sign.  What they was saying, that if -- as

11   far as they was saying crimes considering, they said

12   even if it was a traffic citation they said you would

13   have to put down yes, which is ludicrous to me.

14       Q    So did you -- you once got a traffic citation

15   for running a stop sign or something in Union City?

16       A    That's what they had said.  Basically, I'm not

17   going to say I was innocent.  She have to make a quota,

18   and that's what she did.  But it wasn't that type of

19   citation.

20       Q    Have you ever been convicted of any crimes?

21       A    I couldn't -- I wouldn't be a -- I couldn't get

22   a gun license if I did, and I couldn't be a notary if I

23   did.

24       Q    So the answer to my question is no?

25       A    That's correct.

1     Q    Have you ever filed for bankruptcy?

2     A    That's correct.

3     Q   Yes?

4     A    Yes.  That's common knowledge.  Wackenhut is

5 aware of that because my salary was garnishee.

6     Q    And how many times have you filed for

7 bankruptcy?

8     A    Oh, once.

9     Q    And when was that?

10    A    I don't know offhand.  I'm sure Wackenhut got

11 that information.  I believe they got themselves in

12 trouble for stealing one of my checks.

13    Q    Well, I'll represent that I have not seen any

14 information about a bankruptcy filing by you, but you

15 filed it during your employment with Wackenhut?

16    A    Right.  And my salary -- because that case that

17 I told you with Union City, my salary was garnisheed,

18 and when I filed for bankruptcy, the lawyers that I --

19 that I had -- I filed the bankruptcy also removed the

20 garnishee, so Wackenhut knows all about it.  They got

21 all the records on it.

22    Q    How was that bankruptcy petition resolved?

23    A   Under Chapter 7.

24    Q    And what was the name of the court in which you

25 filed that in?  Was that the United States Bankruptcy

1    Court for the Northern District of Georgia?

2        A    It must have been.  I didn't do it.  I did it

3    through attorneys.

4        Q    Who were your attorneys?

5        A    I can't -- I don't know offhand, but it's --

6    they very well known.  Matter of fact, that's all they

7    do is bankruptcy cases.  I couldn't tell you the name of

8    them, not offhand.

9        Q    Do you remember the name of your individual

10   attorney?

11       A    It's -- it's more like a factory-type thing

12   because that's all they did.  So I don't know her name

13   offhand, no.

14       Q    Is she located in Atlanta?

15       A    As far as I know, yes.

16       Q    Did you ever visit her firm's law offices?

17       A    When I went and joined the -- when I went and

18   hired them, yes.

19       Q    Where were those offices located?

20       A    Oh, I don't know offhand.  I don't -- you know,

21   not off the top of my head.  But if you get me a yellow

22   pages, I can show that to you.  They in there.

23       Q    Was that inside the Perimeter or outside the

24   Perimeter?

25       A    They -- they have a law firm right here in

1  downtown.  They have them all over, but I -- I went to

2  that particular one because that was their main office.

3      Q    But you don't remember your attorney's name?

4      A    We have an insurance commissioner.  Do you know

5  his name offhand?  Because her -- her last name was the

6  same as his last name.  I believe it was a German name,

7  but I don't -- I don't remember what her name was.  But

8  I do know the insurance commissioner, they both had the

9  same last name.

10     Q    Okay.  As the Georgia insurance commissioner?

11     A    Insurance, yeah.

12     Q    In general, if you would, describe your job

13 responsibilities as a security guard.

14     A    Where at?

15     Q    At Wackenhut.  Not necessarily any assignment,

16 any particular assignment, just in general what you did

17 as a security guard.

18     A    Well, there I was a safety officer there.  As a

19 safety officer, we was told to guard our perimeter.  I

20 called in accidents.  It was MLK, was right there by

21 there at the Sloppy Floyd Building and just basically

22 check IDS and etcetera.

23     Q    So as the security guard, once you're on an

24 assignment, your job is to secure the premises; is

25 that --

1     A    That's correct.

2     Q    And am I right about that security guards are

3 placed on assignment at customer locations?

4     A    Well, we went to several locations.  They

5 usually switched us up a lot until the last -- only

6 around about the last year that I was there was I

7 permanently put in a position at the arger culture

8 (phonetic) building.

9     Q    And you had no -- and what was that assignment

10 you were just referencing?

11    A    Well, that building there it seems that they

12 had trouble of holding down the posts.  The people there

13 was very hard to please.

14    Q    And what was the name of that?

15    A    The agriculture building.

16    Q    How do you spell that?

17    A    Oh, I don't know.

18    Q    Arger culture?

19    A    Yeah, it's where they test the food and stuff

20 like that.

21    Q    Was that an assignment that you were placed on

22 while you were with Wackenhut?

23    A    That's correct.

24    Q    Was that before or after your Google

25 assignment?

1     A     That was after my -- that's before my Google
2  assignment.
3     Q     Okay.  And was that -- did you also work on an
4  assignment at Sara Lee?
5     A     That's correct.
6     Q     Was that before -- the food culture assignment
7  that you're talking about, was that before or after your
8  Sara Lee assignment?
9     A     It was first I worked downtown with the -- in
10 the primitive [sic] of the -- with the government.  Then
11 I went to Sara Lee, and then I went to Googles [sic].
12    Q     And security officers go to the customer's
13 location to perform the guarding services; is that
14 right?
15    A     Can you repeat that?
16    Q     Sure.  You were employed with Wackenhut as a
17 security officer; correct?
18    A     That's correct.
19    Q     And as a security officer, you would go -- you
20 didn't work at Wackenhut's headquarters, did you?
21    A     No.
22    Q     You didn't work at Wackenhut's Atlanta office;
23 right?
24    A     No.
25    Q     Instead you would go to Wackenhut's customers'

1   locations to --

2        A    That's correct.

3        Q    And let me finish.

4        A    Oh.

5        Q    You would go to Wackenhut's customer's location

6   to perform your guarding assignment at that location?

7        A    That's correct.

8        Q    Okay.  And do you know what I mean when I

9   say -- when I say customers in terms of Wackenhut's

10  customers?

11       A    Yes, I do.

12       Q    Okay.  Because I'm going to use that term

13  throughout the day, and I want to make sure we're on the

14  same page in terms of what I mean.  And when I -- when I

15  use that word, I mean Wackenhut's -- the actual

16  customers for which Wackenhut provided security

17  services.

18       A    Well, we called them clients.

19       Q    Clients.  Would you rather me refer to them --

20       A    Yeah.

21       Q    -- as clients?

22       A    This will be better.

23       Q    And the clients in general tell Wackenhut how

24  many guards are needed for their location; is that

25  right?

1      A      I don't know how they program their business.

2   I can only assume that that's what they do, but that's

3   on the manager's level.

4      Q      Okay.  So as a security guard, you're not

5   involved with negotiating how many guards are on an

6   assignment at a -- at a particular client location?

7      A      That's correct.

8      Q      And as a security guard, you weren't involved

9   with negotiating the rates that were paid to the

10  security guards; is that right?

11     A      That's correct.

12     Q      The clients, they also picked the days that

13  guards are needed; is that correct?

14     A      Yes.

15     Q      And they picked the hours that the guards are

16  needed?

17     A      Yes.

18     Q      And once Wackenhut and the client agree upon

19  the days and the hours that the guards are needed, then

20  Wackenhut places the guards on assignments there, and

21  the customers pay Wackenhut an hourly rate for the

22  guards' services; is that right?

23     A      That's correct.

24     Q      And once you're placed on an assignment, you

25  report to that client's location at an agreed upon time

1    and on the -- your scheduled days; is that right?

2         A    That's correct.

3         Q    And in general, if a client asks Wackenhut to

4    end a guard's assignment, Wackenhut is supposed to

5    follow its -- its client's instructions?

6         A    I have -- I have no -- I mean, I can probably

7    answer that, but that -- that has nothing to do with me.

8    That's -- like I said, that's -- that's management.

9         Q    Right.

10        A    That's not me.

11        Q    And I realize that.

12        A    Uh-huh.

13        Q    But that's your understanding of how the

14   business worked, if a Wackenhut client says we want to

15   order -- or we want to end Jay Ferguson's guarding

16   assignment, then Wackenhut was supposed to honor its

17   client's request?

18        A    That's -- that's within management.

19        Q    So that -- that would be a management decision

20   that was beyond your control?

21        A    That's correct.

22        Q    And I want to ask a hypothetical question.   If

23   a guard is caught sleeping on -- on the job, is that

24   grounds for the ending of his or her assignment?

25        A    That's Wackenhut's standard, yes.

1     Q    And Wackenhut has rules which prevent guards

2  from sleeping during their shifts; right?

3     A    Wackenhut -- and I personally seen this.

4  Management sleep on jobs.

5     Q    Okay.

6     A    And at the Googles place, they will come there

7  and go to sleep.

8     Q    Well, that's not my -- my question was:

9  Wackenhut has rules which prevent guards from sleeping

10  during shifts; right?

11     A    Of course, yes.

12     Q    And if a guard is caught sleeping, then that's

13  grounds for termination per Wackenhut's rules?

14     A    That's correct.

15     Q    Do you know who made the decision to hire you?

16     A    No, sir.

17     Q    In what city did you work when you were hired

18  by Wackenhut?

19     A    What city did I work in?

20     Q    Yes.

21     A    Atlanta.

22     Q    Have you ever worked for Wackenhut in a

23  different city?

24     A    Not that I know of.

25     Q    Did Wackenhut interview you?

1    A    Yes.

2    Q    Who conducted that interview?

3    A    I couldn't tell you offhand.

4    Q    Was it a male or female?

5    A    I believe -- no, the trainer was a female.  I

6  guess it was a male.  I'm not sure.

7    Q    Where did that interview happen?

8    A    At their main office.

9    Q    And where is that main office?

10   A    I couldn't tell you that offhand.  I guess it

11  could be here somewhere, but I don't -- I don't know

12  offhand, you know, where their main office is.

13   Q    Is it in Marietta?  Does that sound right?

14   A    That sounds correct.

15   Q    Any time you want to see these just -- what I'm

16  handing you is an exact copy of what she has here.

17   A    Oh, I know.

18   Q    Okay.  And it's an exact copy of what I've got

19  here, too.

20       (Defendant's Exhibit No. 6 was marked.)

21  BY MR. FERGUSON:

22   Q    Mr. Jones, I've handed you what's been marked

23  as Exhibit 6.  When you began your employment with

24  Wackenhut, you -- you attended an orientation session;

25  right?

1     A   That's correct.

2     Q   And have you seen this document before, what

3  we've -- what we've marked as Exhibit 6?

4     A   It's my handwriting, but as far as document's

5  concerned, I think we had about a hundred of them that

6  we had to sign.

7     Q   So is that your signature appearing on the

8  first page of Exhibit 6?

9     A   That's correct.

10    Q   And is that your signature appearing on the

11  third page of Exhibit 6?

12    A   That's correct.

13    Q   To your recollection, does this document list

14  the topics that were covered during your Wackenhut

15  orientation session?

16    A   Well, we had, I think, a three-day orientation

17  session. I think it was three days, or it could have

18  even been a week. So it was a lot of things that was

19  covered.

20    Q   Do the topics that are listed here on pages 1,

21  2, and some on 3, do those appear to be the topics that

22  you covered during orientation?

23    A   It could be. It looks like my initials.

24    Q   And that was my next question. It looks

25  like -- I see your initials throughout this document,

1    and were you initialing the box to reflect that you had

2    covered the topic to the left of that box?

3         A    That's correct.

4         Q    For example, let's look on page 2.

5         A    Uh-huh.  Got you.

6         Q    I see there's one topic there that says

7    disaster response.

8         A    Yes, we went through that.  I was a CPR with

9    Wackenhut.

10        Q    And to the right of that box is -- is your

11   initials; correct?

12        A    That's correct.

13        Q    And was that -- were you initialing that box to

14   demonstrate that you covered the topic of disaster

15   response?

16        A    That's correct.

17        Q    And let me back up to Part 4 on the first page.

18   I see that you initialed the box next to the topic of

19   received security officer handbook.  Do you see that?

20        A    That's correct.

21        Q    And then beneath that, it looks like you

22   initialed a box for completing the security officer

23   handbook exam?

24        A    That's common with security.

25        Q    So you were given a copy of the handbook, and

1    then did you take a test on the handbook?

2        A    I'm not sure.  I know they gave us a test on a

3    lot of items there.

4        Q    Do you recall whether you took a -- well, your

5    initials here indicate that -- would you agree that your

6    initials here indicate that you received the handbook

7    and completed a -- a handbook exam?

8        A    The initials there would -- says that I

9    completed the handbook, but I don't know if it was a

10   handbook exam.  But as I said, we had a very lengthy

11   training period.  You know, it could have been just

12   about on -- on everything.

13       Q    But do you recall receiving the -- well, strike

14   that.

15            (Defendant's Exhibit No. 7 was marked.)

16   BY MR. FERGUSON:

17       Q    All right.  Mr. Jones, I want to hand you what

18   we've marked as -- we're at Exhibit 7.

19       A    Uh-huh.

20       Q    Have you seen this document before?

21       A    I can't say offhand.  I seen a handbook, but I

22   can't say that that's the one that I received.

23       Q    Okay.  And I'll give you a minute if you want

24   to look through it.

25       A    No, it's okay.  Matter of fact, the one that I

1  did receive wasn't this color. It was white. I think

2  it was -- it was white. So this is probably could be a

3  updated version of it.

4      Q    So the version of the Wackenhut handbook that

5  you received had a white cover?

6      A    I believe so.

7      Q    And did you receive that during the orientation

8  session?

9      A    That's correct.

10     Q    As you initialed on this Exhibit 6, that you

11  received a security officer handbook?

12     A    Oh, that's correct, yes.

13     Q    And during the orientation, did you cover the

14  policies and procedures that were contained in the

15  security officer handbook?

16     A    That's correct.

17     Q    And then you took a test on the handbook after

18  that?

19     A    We had a lot of tests.

20     Q    Do you recall whether you took a test on the

21  handbook?

22     A    I can't say offhand. But we took a lot of

23  tests. Probably so. I can't say for sure, but we took

24  an awful lot of tests.

25     Q    Now, when you say you took a lot of tests, was

1    that during the orientation?

2         A    That's correct, yes.

3         Q    And that session lasted three days?

4         A    It could be three days up to a week at least.

5         Q    Where did that take place?

6         A    In they main office.

7         Q    In Atlanta?

8         A    Uh-huh.  Yes.

9         Q    Who conducted that?

10        A    I don't know her name offhand, but she's a

11   regular trainer there.  But I don't know her name

12   offhand.

13        Q    Was that Teresa Kirby?

14        A    That's -- sounds like her name.

15        Q    Okay.  And do you remember her job title?

16        A    No, not offhand.

17        Q    Was she in HR at the main office?

18        A    She could have been.  I don't know exactly what

19   her job title was.

20        Q    And so it's your testimony that you did not

21   receive a copy of this handbook that we've marked as

22   Exhibit 7 but that you received another version of

23   Wackenhut's handbook?

24        A    I believe so.

25             (Defendant's Exhibit No. 8 was marked.)

BY MR. FERGUSON:

Q    And, Mr. Jones, I've handed you what we've marked as Exhibit 8.  Have you seen this document before?

A    I can't say so.  It looks like a common document that the companies have.

Q    Who is Thomas Johnson?

A    I really couldn't tell you.  I don't know.

Q    Did you meet him during your employment with Wackenhut?

A    I can't remember his name.  I remember faces. I'm bad with names.

Q    Do you remember what -- strike that.

Do you recall receiving a copy of this memo, though?

A    No, I -- I don't.

Q    And other than your -- well, let me back up to staying with this exhibit.  Does -- it looks to me like this exhibit discusses violations of Wackenhut policies and procedures.  Would you agree?

A    That's what it looks like, yes.

Q    And would you admit that Wackenhut had rules in place regarding Nos. 1 through 9 here?

A    I don't know.  The companies basically have rules.  These look like basic rules that companies have,

1   any company that would have.

2       Q   And so these were -- these appear to be basic

3   rules that Wackenhut had?

4       A   They seem to be basic rules that any company

5   would have.

6       Q   Including Wackenhut?

7       A   That's correct.

8       Q   And other than your security guarding position,

9   did you hold any other job titles during your employment

10  with Wackenhut?

11      A   No.

12      Q   And I want to spend some time on the different

13  guarding assignments that you worked on with Wackenhut.

14  How many guarding assignments did you -- did you work on

15  that you can recall?

16      A   At the -- my entire employment at Wackenhut?

17      Q   Yes, sir.

18      A   I should say three: the one downtown with the

19  government, at Sara Lee, and Googles.

20      Q   So the government.  And was that -- was that

21  the one you described earlier that involved food

22  culturing, I believe you said?

23      A   Yes, the agriculture building.  Yeah.

24      Q   Oh, agriculture building?

25      A   Right.

1    Q    Okay.  So Wackenhut's client there was the

2  State of Georgia?

3    A    That's correct.

4    Q    Okay.  And you were on assignment at the

5  agriculture building for the State of Georgia?

6    A    That's correct.

7    Q    How long were you on assignment there?

8    A    About six months.  Then they lost the contract.

9    Q    And was -- if you started at Wackenhut in

10  February of 2003, when did your assignment at the

11  agricultural building begin?

12    A    I can't say.  I do know that the commissioner

13  there, he was complaining about Wackenhut security

14  guards there saying that they wasn't properly trained,

15  that they wasn't alert enough, but -- and they rotated

16  us.  And I came to his attention because he says I was

17  one of the ones who was alert and whatnot, and he told

18  Wackenhut to put me there permanently.

19    Q    And why did your assignment at the agricultural

20  building end?

21    A    They lost the contract.

22    Q    They being Wackenhut?

23    A    That's correct.

24    Q    And after that assignment ended, was your next

25  assignment at Sara Lee?

1       A     That's correct.

2       Q     Where was the -- where was -- and where is Sara

3   Lee located?

4       A     I believe it's on Fulton Industrial.  I'm not

5   sure.

6       Q     Who was your supervisor there?

7       A     I don't remember the gentleman's name.

8       Q     Do you remember his job title?

9       A     He was a low-paying supervisor.  You know,

10  Wackenhut had this priority whereas that unless you had

11  a police background or military background they put you

12  on -- if they did make you a manager, they didn't pay

13  you well.

14      Q     And when did your assignment at Sara Lee begin?

15      A     Oh, I don't know.

16      Q     Would it have been in -- you said you were on

17  assignment at the agricultural building for

18  approximately six months?

19      A     Right.

20      Q     So would that have been in 2004 that you

21  started at Sara Lee?

22      A     They could have been.

23      Q     How long were you on assignment at Sara Lee?

24      A     It wasn't long, maybe a few months.  I don't

25  know for sure.

1    Q    And why did that assignment end?

2    A    I think I went for the Googles because they

3    paid more money.

4    Q    So you went from your Sara Lee assignment to

5    the Google assignment because the -- the Google contract

6    provided security officers with a higher hourly rate?

7    A    Well, at Googles not only did you pay higher

8    but Wackenhut for the first year you get one week's

9    vacation and then you get two weeks vacation after five

10   years.  But if you worked at Googles, you was actually

11   hired by Googles.  You was -- had dual employment.  And

12   therefore, when you got one week's vacation and then the

13   second year, you -- I think you got two weeks' vacation.

14   When Google employees got a raise, you got a raise.  So

15   you actually was hired by Googles.

16        When they -- when you were sent to Googles, you

17   actually have to make out an employment application --

18   Q    Uh-huh.

19   A    -- like if you was going there for a job.  And

20   if they rejected you, then you was removed.  If they

21   accepted you, then you stayed.  But when you stayed

22   there, you got all the benefits that Google employees

23   got.

24   Q    And you were -- you were an at-will employee at

25   Wackenhut, weren't you?

1     A    Repeat that.

2     Q    Sure.  Well, let me ask it a different way.

3  You didn't have a contract of employment with Wackenhut;

4  right?

5     A    Of course.  Any time you sign -- every -- well,

6  if you sign -- if you get hired for minimum wage, then

7  that's an application.  But if you're getting paid

8  professionally and I'm -- and I'm being hired as a

9  professional, then that's a contract.

10     Q    Well, let me -- so it's your claim today that

11  you signed a contract of employment with Wackenhut?

12     A    That's correct.

13     Q    And I'll represent to you I haven't seen any --

14  any contract.  Is it your -- or was that -- was your

15  employment with Wackenhut for any specific period of

16  time?

17     A    No, it wasn't no 'pecific period of time.  But

18  as far as wages is concerned and based on my

19  professionalism, that's what they hired me for.

20     Q    But your employment with Wackenhut, you admit

21  that you could resign at any time; is that correct?

22     A    With a two weeks' notice, or one week, two

23  weeks' notices, yes.

24     Q    And Wackenhut could likewise end your

25  employment at any time?

1    A    No, they can't.  They've got to do it legally.

2    Q    Well, I understand that.  But they didn't have

3    to -- Wackenhut still had -- you'll agree that Wackenhut

4    had the right to end your employment at any -- at any

5    given time during your employment if they did that

6    legally?

7    A    If they did it legally.  But they would have to

8    have a good reason.

9    Q    Right.

10    A    I mean, you just can't fire a person just

11    because you don't -- all right.  I don't need you no

12    more, you know, fire you.  That's what the EEOC does.

13    Q    And did you -- did you actually sign a contract

14    of employment that was given to you by Wackenhut?

15    A    Well, this is what I would consider as a signed

16    contract, the application (indicating).  That's what I

17    would consider as a signed contract (indicating).

18    Q    And so you're pointing to Exhibit --

19    A    The application for employment.

20    Q    -- Exhibit 4 as the contract?

21    A    Right.

22    Q    And you signed no other contracts with

23    Wackenhut; right?

24    A    Not that I know of.  And that contract

25    consisted of equal opportunity, affirmative action on

1    employee, and etcetera.

2        Q    Right.  And, Mr. Jones, I want to direct your

3    attention to the last page of this exhibit, Exhibit 4.

4    There's an understandings and agreement section there.

5    Do you see that?

6        A    Well, I'm familiar with these type of things,

7    even though I haven't read -- read the bottom of it.

8    But a lot of employees [sic] put a lot of stuff down

9    on -- on --

10       Q    Well, I'm going to ask some specific --

11       A    Okay.

12       Q    -- questions.

13       A    All right.

14       Q    I'm just going to give you a minute to review

15   that understandings and agreement section, please.  And

16   let me know when you've had a chance to review it.

17       A    Okay.  I'm ready.  What is it?

18       Q    Okay.  In the -- in that first paragraph under

19   the understandings and agreement section --

20       A    Uh-huh.

21       Q    -- it says:  My employment and compensation may

22   terminate with or without cause and with or without

23   notice at any time at the option of either Wackenhut or

24   myself.

25       A    That's -- that's an illegal statement.  That's

what I was saying before, that an employee [sic] puts
all type of stuff down there.  And the reason why it's
not legal to do that, because one thing the employee has
a gun at his head.  If he doesn't sign it, he's not
going to be hired.  If you don't agree to it, then
you're not going to be hired.  And there -- and that's
why under the law that's not legal.  The law --

  Q    So you're saying that Wackenhut's job
application is -- is in and of itself -- or does in and
of itself violate the law?

  A    Under federal law, because you cannot fire a
person without just cause under -- you know, maybe under
Georgia law, but EEOC law -- and this is why I go
through the EEOC because that's the -- that's under
federal law.  You can't do it without just cause.

  Q    So your understanding of federal law is that an
employee can't be terminated except for -- that an
employee can only be terminated for just cause?

  A    Yes.  In other words, they have to have a
reason.

  Q    And what federal law are you relying on there?

  A    There's only one federal law that covers the
United States.

  Q    And what is that?

  A    That's the EEOC.  That covers Georgia.  You

1   can't fire a person without just cause.  They stopped

2   that a long time ago.  And, now, I do know that under

3   state law, Georgia allows a person to be fired for no --

4   without reason and no explanation.  But federal law does

5   not allow you to do that.  That's what the equal

6   opportunity law is.

7      Q   And you're talking about Title VII of the Civil

8   Rights Act?

9      A   Yes.

10      Q   So is it your belief that Title VII only allows

11   employers to terminate employees for just cause?

12      A   Yes.  Yes.  All employees [sic] got to fire a

13   person without just cause.  You just can't just

14   terminate a person for reason, and this is why you got

15   your equal opportunity because you just -- maybe you

16   want to just fire a person because he is Jewish or

17   because he's [sic] a woman or because he's black.  No,

18   you got to have a good reason.  That's not reason to

19   fire a person.

20      Q   But you'll admit that you as the employee, you

21   could resign at any time with notice; right?

22      A   With notice, yes.

23      Q   Right.  And that's what you did here, you

24   resigned from Wackenhut with --

25      A   No, I was forced off the job.  They was ready

1    to fire me, so I -- as a matter of fact, when I went and

2    filed the retaliation charges, the conversation that the

3    investigator and I had was, well, when they get this

4    notice here they going to let you go, so....

5         Q    And you submitted a resignation letter to

6    Wackenhut; correct?

7         A    I filed the charges, but I know from experience

8    that it takes two weeks once you file those charges.

9         Q    Well, that wasn't my question.  My question

10   was:  You submitted a resignation letter to Wackenhut;

11   correct?

12        A    I wouldn't say it was a resignation.  Like I

13   said, I was forced to -- to resign.

14        Q    But you submitted -- isn't it true that you

15   submitted a letter to Wackenhut telling Wackenhut that

16   you were resigning?

17        A    Yes, under force.  I was being forced off the

18   job.

19        Q    And we'll get into that later today.  We'll

20   come back to that topic.

21        A    Oh, okay.

22        Q    At Sara Lee what were the days and hours for

23   your shifts?

24        A    Oh, I -- I can't tell you offhand.

25        Q    Approximately how many hours per week were you

1    working at Sara Lee?

2    A    Well, the law says 40 hours, and I worked --

3    was working 40 hours.

4    Q    So you were working about 40 hours --

5    A    40 hours, plus -- 40.  If there was overtime, I

6    took it.

7    Q    What -- what shift were you on?  Was it a day

8    shift or a night shift?

9    A    I believe it was the second shift.

10    Q    What were those hours?

11    A    I can't tell you offhand.

12    Q    Would that be roughly afternoon to midnight?

13    A    Something like that.

14    Q    And who set those hours?

15    A    The manager, he's the one that set the hours.

16    Q    The Wackenhut manager for -- that was in charge

17    of the Sara Lee assignment?

18    A    That's correct.

19         (Defendant's Exhibit No. 9 was marked.)

20    BY MR. FERGUSON:

21    Q    Mr. Jones, I've handed you Exhibit 9.  Have you

22    seen this document before?

23    A    No.

24    Q    Who is Derryl Fountain?

25    A    Well, he was the manager there.

1     Q    He was -- was he a Wackenhut employee?

2     A    Yes, he was.

3     Q    And was he the Wackenhut manager at the -- or

4 over the -- strike that.

5          Was he the Wackenhut manager in charge of the

6 Sara Lee account?

7     A    That's correct.

8     Q    And he mentions some reprimands that were

9 issued to you in this letter.

10    A    I never signed any recommend [sic], and to me,

11 this is nothing but false statements by Wackenhut, you

12 know, trying to help -- self-serving.  They trying --

13 they was trying to help themselves.

14    Q    Were you ever reprimanded during your time at

15 Sara Lee?

16    A    I never signed anything, so, no.

17    Q    And I understand.  So it sounds like you were

18 never issued a written reprimand; is that right?

19    A    Well, actually, if there is no written

20 recommendation [sic], then there is nothing.

21    Q    Do you recall ever receiving any verbal

22 counseling during --

23    A    I --

24    Q    Please let me finish.  Do you recall receiving

25 any verbal counseling during your guarding assignment at

1   Sara Lee?

2      A   At Sara Lee you find out you got very

3   unprofessional people at Wackenhut, and what you do is

4   when they talk you just let it go right by your head.

5   As long as you don't sign nothing, they have nothing

6   against you.

7      Q   Well, and let me -- if you could please answer

8   my question.  Do you recall receiving any verbal

9   reprimands or counseling during your Sara Lee

10  assignment?

11     A   No, nothing at all.

12     Q   Were you reprimanded for sleeping on the job

13  during the Sara Lee assignment?

14     A   I'm saying point blank that this statement

15  right here was made after the fact, after I left

16  Wackenhut, and it's just a trumped-up piece of

17  statement.  That's all it is.

18     Q   And this note mentions destruction of property

19  on two occasions.  What is that referring to?

20     A   There's got to be something with my signature

21  on it, so I don't know what he's talking about.

22     Q   So you -- as you sit here today, you dispute

23  what Derryl Fountain has written here?

24     A   He's a Wackenhut employee, and I am suing

25  Wackenhut.  He has to do -- he has to -- since he's in

1    management, he has to do whatever Wackenhut tells him to

2    do.

3        Q    What is Mr. Fountain's age approximately?

4        A    I think he was under 30.

5        Q    What is his race?

6        A    Black.

7        Q    So is it your testimony -- or do you deny that

8    you were reprimanded for destroying property at Sara

9    Lee?

10       A    If I -- under -- under any rules, if property

11   and stuff was destroyed and I -- they should have some

12   type of written recommendation [sic] stating that I did

13   it, and then I signed it.  I don't see nothing with my

14   signature on it.

15       Q    And I know.  My question was:  Are you denying

16   that you destroyed property at Sara Lee?

17       A    I'm stating that everything on this piece of

18   paper is a lie.

19       Q    So you deny destroying property at Sara Lee?

20       A    That's correct.

21       Q    And you were formerly on an assignment as a

22   Wackenhut security officer at Google?

23       A    That's correct.

24       Q    And you went from -- am I correct that once

25   your Sara Lee assignment ended you went to the Google

1   assignment?

2       A    That's correct.

3           And I'd like to also bring up, I see something

4   here that says sleeping on the job, alcohol, etcetera.

5   If I was a manager of Googles or any other place, if I

6   sat down and read something like this, I wouldn't have

7   them -- I wouldn't have this person working for me.

8       Q    I understand.  So you're just -- when you said

9   that, you're disputing -- you're still disputing

10  Mr. Fountain's statement?

11      A    That's correct.  There's no merit to it.

12      Q    And I've moved on.  I have no further questions

13  about that document.

14          Where is Google's facility located in Atlanta?

15      A    Offhand I do know that it's on Camp Creek.

16  Okay.

17      Q    Camp Creek Parkway?

18      A    Right.  There's -- you go one stop -- one exit

19  past Fulton Industrial, you make a right, and that's

20  where it is.

21      Q    And when did your assignment start at Google?

22      A    Well, it says here December 22nd.  August to

23  December 22, so it had to be around December 22nd.

24  Because he said that's when at Sara Lee it ended.  I

25  left Sara Lee and went to Googles.

1     Q    Okay.  So you're referencing Exhibit 9.  And

2 it's your recollection that your assignment at Sara Lee

3 ended in December of 2005?

4     A    Right.

5     Q    And then you went to -- or to the Google

6 assignment in December or January -- December of 2005 or

7 January of 2006 from --

8     A    Right.  I don't think there was a -- there

9 wasn't no break in my employment.

10    Q    Okay.  So your assignment at Google started in

11 December '05 or January '06?

12    A    I say right after -- he says December 22nd, so

13 I said on December 23rd I went to Google.

14    Q    Okay.  And who was your supervisor at Google?

15    A    Let me see.  Ms. Jennifer Turner.

16    Q    And she's a Wackenhut employee?

17    A    That's correct.

18    Q    What was her job title?

19    A    She was manager.

20    Q    Was she actually on-site at Google?

21    A    That's correct.

22    Q    And what is her race?

23    A    Black.

24    Q    How old approximately is she?  Or do you know

25 her date of birth?

1     A    No, I don't.  I'll say she was in her -- she

2    was over 40, in her mid 40s.

3     Q    Did you get along with Ms. Turner?

4     A    In the beginning, yes.

5    Everybody got along with her in the beginning,

6    but then after that, she just was basically a head case.

7    Going back to the records that you sent me, I don't --

8    within that two years' period, 230 something employees

9    went in and out of there.  What she was was -- she -- as

10    I said in my first charge, that she stated that she

11    would fire everybody.  And that's basically what she

12    would do.

13     Q    Did you develop a personality conflict with

14    Ms. Turner?

15               (Phone interruption.)

16            THE WITNESS:  I'll call her back later.

17        I don't know offhand what you mean by that.

18    BY MR. FERGUSON:

19     Q    Well, you said in the beginning you got along

20    with her, with Ms. Turner, but then some -- but then

21    towards the end of your assignment, you did didn't get

22    along with her; is that correct?

23     A    Yes, that was common with her.  She got -- she

24    got along with people in the beginning, but as soon as

25    she -- as soon as --

1          (Phone interruption.)

2          THE WITNESS:  Let me cut it off.  All

3          right.  That's the way she was.  If she didn't

4          have -- when she found out that you -- she

5          could not control you, then she got rid of you.

6          And this was a common thing with her, and the

7          records that you reflect to me showed me --

8          showed that because I heard about it and I seen

9          it myself.

10   BY MR. FERGUSON:

11       Q    So towards the end of your assignment, you and

12   Ms. Turner didn't see eye to eye?

13       A    That's correct.

14       Q    Okay.  And at Google what were the days and

15   hours of your shift?

16       A    I believe it was the second shift.  I don't

17   know exactly what hours was that.  But it was -- oh,

18   wait a minute.  I had to --

19       Q    I've seen something that maybe you worked the

20   night shift?

21       A    The night shift, yeah.  I think it was

22   something about 11:00 to 7:00 in the morning, something

23   like that.

24       Q    Would that be the third shift?

25       A    That would be the third shift.

1    Q   Okay.  The graveyard shift?

2    A   Right.

3    Q   And how many days a week were you working at --

4 at Google during the Google assignment?

5    A   Well, I worked my 40 and whatever overtime I

6 can get.

7    Q   So you were working approximately 40 hours a

8 week, sometimes more?

9    A   Yes.

10    Q   And how many Wackenhut guards worked on that

11 shift with you?

12    A   Oh, I can't say offhand, but I think there was

13 quite a few security guards there at the time.  But I

14 don't know exactly how many.

15    Q   During that third shift, was it more -- was it

16 five Wackenhut guards that worked there?

17    A   It could have been.

18    Q   Was it more than five?

19    A   It could have been.  I don't know for sure.

20    Q   Was it more than ten?

21    A   I can't say.

22    Q   Was it more than 20?

23    A   I can't say.

24    Q   Because I want to narrow it down in terms of --

25    A   Well, I don't recall 'cause -- since I'm not

1    there, I cannot say for sure just how many it was.  I

2    can say anywhere between 5 and -- 5 and 15.

3        Q    Okay.

4        A    Yeah.

5        Q    So between 5 and 15 -- during your third shift

6    between 5 and 15 Wackenhut guards were on -- were

7    working that third shift?

8        A    That's correct.

9        Q    And was Ms. Turner, was she on-site during the

10   third shift?

11       A    If she -- if she was doing overtime, then she

12   would.  If not, then she would -- she would leave -- she

13   would stay late most of the time, but she would leave

14   maybe around nine, ten o'clock.  If she took another --

15   somebody -- somebody didn't show up and she wanted to

16   work that shift, then she stood there.

17       Q    So she sometimes filled in for guards who

18   didn't --

19       A    Yes.

20       Q    -- show up?

21       A    Yes.

22       Q    What shift did she typically work on?

23       A    Well, if she's a manager, she has to work the

24   first shift.

25       Q    So she would work during the -- she would work

1    days?

2        A    That's correct.

3        Q    Were you and Ms. Turner -- how often did you

4    and she work the same shift?

5        A    We didn't work the same shift, but sometimes

6    she may overlap into my shift.  I say there was

7    sometimes I worked -- even though I worked the graveyard

8    shift then, there was times that I worked the second

9    shift.  And that's when we would be together.

10       Q    So when you worked second shift, was that

11   because you would be filling in for somebody?

12       A    Filling in with somebody or they had switched

13   me over.

14       Q    And did all of the Wackenhut guards on

15   assignment at Google report to Jennifer Turner?

16       A    That's correct.

17       Q    Describe for me, if you would, the layout of

18   the Google facility.  Was it -- is it just one building?

19   Was it multiple buildings?  How would you describe it?

20       A    Well, it was one large building.

21       Q    One large building?

22       A    Right.

23       Q    And how many floors were in that building?

24       A    Oh, I say maybe five.

25       Q    Was there a guard stationed to get onto the

1  property?

2      A    No, just a driveway.  We post at the driveway.

3      Q    And what do you mean by that?

4      A    In other words, before you can drive on the

5  property, we would stop you.

6      Q    And was there a security gate where a

7  Wackenhut -- a security post where a Wackenhut guard

8  would be at a gate on the property?

9      A    No.  If we did anything, alls we did was just

10  put one of those wooden blockades there, and when you

11  come down, we would stop you.

12      Q    And then -- or why was there a wooden blockade

13  there?

14      A    To keep people from just coming in.  In other

15  words, they have one way in, one way out, so we block

16  the one way out.

17      Q    Well, describe for me, was it a -- once you're

18  coming onto the Google -- or coming to the Google

19  building, is it a long driveway that you have to drive

20  down, or how would you describe it?

21      A    No, it's not that.  It's -- maybe it's about 50

22  yards.  You just turn in.  But as I said, we be posted

23  right there, and we would stop you, check your ID to see

24  if you had reasons to be on the property.

25      Q    And so that was a Wackenhut guard who was --

1    who was on assignment at a post outside?

2        A    That's correct.

3        Q    And that Wackenhut guard, would he go up --

4    would he or she go up to the visitor's car and ask for

5    ID or --

6        A    Right.

7        Q    -- how would that work?

8        A    As soon as that -- as you see somebody turning

9    in, that's when you just walk up, and you flag them

10   down.

11       Q    Where would that Wackenhut guard sit during

12   that -- during that shift?

13       A    In a chair underneath a tree.

14       Q    Outside?

15       A    Outside.

16       Q    Okay.  And so when that guard sees somebody

17   coming down the driveway, he or she gets up, goes to the

18   car, and stops the car?

19       A    That's correct.

20       Q    Okay.  And where a guard works during a shift,

21   that's called a post?

22       A    That's correct.

23       Q    Did you have an assigned post during your

24   Wackenhut assignment?

25       A    All our posts basically was rotated.  You

1   didn't work one steady post.  You worked at a post maybe

2   for about three hours, and then you go to another post

3   and three hours, then you go to another post.

4       Q    So during your shift, you would rotate posts?

5       A    That's correct.

6       Q    How many posts did Wackenhut have at Google?

7       A    Oh, I don't know offhand.  I can say up to ten.

8       Q    And could you just tell me where those

9   different posts were on the -- or in the building and on

10  the property --

11      A    Mostly --

12      Q    -- to your recollection?

13      A    Okay.  It would mostly be at the entrances, you

14  know, the doors.  In the back they would have one at the

15  gate whereas that you couldn't come in unless, of

16  course, we open up the gate for you.  And then, of

17  course, you would have your rovers who would relieve the

18  person for lunch or if they got to go to the bathroom.

19  That's about it.

20      Q    So there was a Wackenhut rover there, too?

21      A    There was about at least two rovers.

22      Q    And the rover's job was just to go from post to

23  post just providing relief for the guards?

24      A    That's correct.

25      Q    It sounds like Wackenhut took -- well, it

1  sounds like Google took a lot of steps to keep people

2  out of the building. Is that fair to say?

3      A    It's supposed to be a secret place. In other

4  words, nobody was supposed to know that it was Google.

5  We have to sign papers stating that we would not tell

6  anybody that this was a Google building.

7      Q    Who -- who made you sign those papers?

8      A    Google.

9      Q    And what did those papers say?

10      A    It said something on the order that I will not

11  disclose that this is a Google factory, etcetera.

12      Q    So were you -- you were not allowed to tell

13  your friends or family that you worked on assignment at

14  Google?

15      A    That's what they -- that's what it was supposed

16  to be all about.

17      Q    Why did they do that?

18      A    Because they didn't want their competition to

19  know that they had that building there.

20      Q    In Atlanta?

21      A    Uh-huh.

22      Q    Did you ever ask why they didn't want the

23  competition to know?

24      A    No. They -- they just said that -- well, they

25  had demonstrations -- when they did have demonstrations,

1  they had demonstrations at other Google companies, so

2  they didn't want any demonstrations there.

3      Q    Were they -- were they concerned with

4  protecting their trade secrets and their confidential

5  stuff?

6      A    That's correct.

7      Q    Did they take -- so it sounds like they took a

8  lot of measures and steps to protect those -- that

9  confidential information and trade secrets?

10     A    That's correct.

11     Q    And during your Google assignment, did you work

12  at each of the different ten posts there?

13     A    Yes.

14     Q    Because they were rotating?

15     A    That's correct.

16          (Defendant's Exhibit No. 10 was marked.)

17  BY MR. FERGUSON:

18     Q    Mr. Jones, I've handed you what we've marked as

19  Exhibit 10.  Is that your signature appearing at the

20  bottom of Exhibit 10?

21     A    Yes, it is.

22     Q    And is that -- is that your handwriting where

23  you've written in the date here?

24     A    That's correct.

25     Q    So in April of '06, you were on assignment at

1   Google; right?

2       A    That's correct.

3       Q    What is this document here?

4       A    Standard rules and requirements.

5       Q    And who gave you this -- or have you seen --

6   well, obviously, you've seen it because you signed it.

7   Who gave you this document?

8       A    Oh, probably Ms. Turner.

9       Q    Jennifer Turner?

10      A    Yes.

11      Q    And in No. 15:  All policies and procedures

12  given by Google must be followed to the fullest at all

13  times.  There are no exceptions.  Do you see that?

14      A    That sounds like standard procedure.

15      Q    So did Google have some strict policies and

16  procedures that the Wackenhut security guards were

17  supposed to follow?

18      A    That's correct.  Like I said, you were a Google

19  employee.

20      Q    And in No. 7:  Security officers must report to

21  duty on time.  If he/she is late, then the officer must

22  call the supervisor.  What does that say?  Is that at

23  least four hours earlier?

24      A    That's what it -- yes, that's what it looks

25  like.  Uh-huh.

1  Q   So do you remember that rule that you were --

2  if you were going to be late, then you had to call your

3  supervisor, Ms. Turner, four hours in advance?

4  A   That's correct.

5  Q   Everybody going okay timewise?  We can take a

6  break.  We can take a lunch break.

7  A   No, let's go.

8  Q   Who is J.E. Penifold?

9  A   I believe he was a supervisor with Google.

10  Q   Was he a Google employee?

11  A   That's correct.

12  Q   Does the title Google facility manager sound

13  correct to you?

14  A   It could -- he could have been.

15  Q   But he was not employed by Wackenhut?

16  A   No.

17  Q   What were his duties as -- as a manager at

18  Google?

19  A   I don't know.  I know him and Ms. Turner shared

20  the same office.  That's the only thing I know about

21  him.

22  Q   What was he in charge of?

23  A   I don't know.

24  Q   Did you report to him?

25  A   No, sir.

1     Q    So he didn't supervise you at all?

2     A    No.

3     Q    Did you have to complete training to become a

4 Wackenhut guard at Google?

5     A    That's correct.

6     Q    If you could, describe that training for me.

7     A    I couldn't remember.  They just -- oh, it was

8 you have to know how to reboot the -- the computers.

9     Q    How long was that, that Google training?

10    A    I think a day.

11    Q    One whole day?

12    A    Yes.

13    Q    And am I correct that the Google facility is

14 not open to the general public?

15    A    No.

16    Q    That's correct?

17    A    That's correct.

18    Q    Do you know whether Wackenhut ever received any

19 complaints from Google about you?

20    A    Not outside that last one that J.C. Pittman

21 [sic], whatever his name, he made up at the request of

22 Jennifer Turner.

23    Q    So you're aware of one complaint that Google

24 submitted to Wackenhut about you?

25    A    That's when I left, yes.

1    Q    And who submitted that -- which Google employee

2  complained about you?

3    A    The same one, that J.C. Penning [sic], whatever

4  his name is.

5    Q    J.E. Penifold?

6    A    Yes, he was the one at the request -- as I

7  feel, under the request of Jennifer Turner.

8    Q    So you believe that Ms. Turner asked

9  Mr. Penifold to submit a complaint about you?

10    A    Right.  They knew each other for about two or

11  three years.  They shared the same office for two or

12  three years.

13    Q    But Mr. Penifold never told you that Ms. Turner

14  made that request?

15    A    Mr. Penifold never said anything to me at all.

16    Q    So it's just your personal belief that

17  Ms. Turner asked him to make up that --

18    A    He lied.

19    Q    Well, but that's just your -- your personal

20  belief that --

21    A    That's correct, because they were that close

22  friends.

23    Q    And I just -- I think we were talking over each

24  other there.  So I want to make sure that I understand

25  your lawsuit correctly.

1    A    Uh-huh.

2    Q    So it's your personal belief only that

3    Ms. Turner asked Mr. Penifold to submit a complaint

4    about you to Wackenhut?

5    A    In order to remove me, because I had filed that

6    first complaint with the EEOC.

7    Q    And other than that personal belief, you don't

8    have any actual proof that Ms. Turner went to him and

9    said, hey, please submit a complaint about Mr. Jones?

10   A    The proof is that he lied.  He never saw

11   anybody sleeping.

12   Q    Well, and I'm going to get into that.  I

13   understand you dispute the -- Mr. Penifold complained to

14   Google that you were sleeping; is that correct?

15   A    That's correct.  At the time that he said that,

16   I was -- I think I had worked a 15-hour shift, and I

17   seen him walk by.  And that was it.  He said he was --

18   walked by twice, which he didn't.  So he -- he had just

19   plain -- well, he lied.

20         I think there was something about I was going

21   onto 17 hours and you're not supposed to work over 15

22   hours, something like that.  She was supposed to --

23   Jennifer Turner was supposed to have sent me a relief.

24   I called up on ten minutes to on that 15 hour to change

25   my battery, you know, and they brought the battery to me