# EXHIBIT B
# PART III

Jones v. Wackenhut &#38;#037; Google Inc.        Doc. 76 Att. 5

1    but no relief.  So I stayed the other extra hours, the

2    17 hours.

3          And then I know she had mentioned, why you

4    stayed over; well, you didn't relieve me.  So here, I

5    got a choice, either I stay over or I just walk out and

6    leave, which would have meant deserting my post.  I

7    think that's what they wanted me to do, and that's what

8    I didn't do.

9        Q    And to whom did Mr. Penifold complain at

10   Wackenhut?

11       A    Of course, it was Jennifer Turner.

12       Q    And were you -- when you -- I'm sorry.  Were

13   you present when he submitted that complaint?

14       A    No, I was not.

15       Q    To your knowledge, on how many occasions did

16   Mr. Penifold complain about you to Wackenhut?

17       A    As far as I know, that was it, the first time.

18       Q    So you only have -- and that's the sleeping

19   incident?

20       A    That's correct.

21       Q    That's the only one you have knowledge of?

22       A    Yes.

23          Well, they had the camera on me.  Google has

24   cameras everywhere.  And they had the camera right on

25   me.  I knew they had a camera on me.  Matter of fact,

1    when the lady brought me batteries, she said, you know

2    we watching you on camera. I said, oh, I know that.

3         But I also believe that they couldn't use the

4    camera because that was my first complaint with the

5    EEOC, that they was using a camera on me and claimed

6    that I was sleeping. And they had no proof of it then.

7    For them to come back and use it again wouldn't have

8    been smart. That's why they used Mr. Penifold.

9        Q    Well, I want to make sure I understand. So you

10   acknowledge that Mr. Penifold complained to Wackenhut

11   that you were sleeping on the job?

12       A    That's what Jennifer Turner told me.

13       Q    And you dispute that?

14       A    That's -- yes, I think we -- we -- we changed

15   the written statements.

16       Q    And are you aware of any other complaints from

17   Google that Wackenhut received about you?

18       A    There wasn't any. If there was, it wouldn't

19   have been -- it would have been in the written

20   statements that I shared with --

21       Q    So the answer is no?

22       A    No, of course.

23       Q    Okay.

24       (Defendant's Exhibit No. 11 was marked.)

25   BY MR. FERGUSON:

1        Q    Mr. Jones, you now have in front of you a copy

2   of Exhibit 11.  Have you seen this document before?

3        A    Yes.

4        Q    And is this the written reprimand given to you

5   after Mr. Penifold complained about you?

6        A    That's correct.

7             And that's also why I said that I was forced

8   off the job.  As you see, the box -- the X says final

9   warning.

10       Q    Right.  And is that your signature appearing at

11  the bottom of this exhibit?

12       A    That's correct.

13       Q    And so you pointed out that final warning box.

14  So after the sleeping incident that Mr. Penifold

15  complained about, Wackenhut gave you a final warning?

16       A    That's correct.

17       Q    And that final warning noted that failure to

18  comply with the conditions of this warning will result

19  in your termination?

20       A    That's correct.

21            (Defendant's Exhibit No. 12 was marked.)

22  BY MR. FERGUSON:

23       Q    Mr. Jones, I've given you Exhibit 12.  I'll

24  give you a chance to review it.  Please let me know when

25  you've had a chance to review it.

1    A    Oh, it's okay.  Go ahead.

2    Q    Okay.  Have you seen this document before?

3    A    No, I haven't.

4    Q    This appears to be two e-mails, the bottom of

5  which is an e-mail from Mr. Penifold to Jennifer Turner.

6  Do you see that?

7    A    That's correct.

8    Q    And in the e-mail Mr. Penifold is complaining

9  to Wackenhut about you sleeping on the assignment;

10  correct?

11    A    That's correct.

12    Q    And the second, the top e-mail, Ms. Turner is

13  forwarding it to a D. Hixon --

14    A    Yes.

15    Q    -- and a C. Garcia.  Do you see that?

16    A    That's correct.

17    Q    Who are -- who are they?

18    A    I know Hixon, I believe he's -- he's in charge

19  of the office, and Garcia, I think he's the -- the area

20  manager.

21    Q    He's a Wackenhut area manager?

22    A    Right.

23    Q    What was his area?

24    A    I think one of the sites that he was over was

25  the Google site.

1    Q    Okay.  So one of the clients under -- and

2  that's Carlos Garcia?

3    A    That's correct.

4    Q    One of the clients under Carlos Garcia's

5  management was Google?

6    A    Yes.

7    Q    How about D. Hixon, who is that?

8    A    I believe he's in charge of the Wackenhut

9  corporation, that business office.  He's the head of it.

10    Q    Oh, the head of the Atlanta office?

11    A    Yes.

12    Q    So did Jennifer Turner report to Hixon?

13    A    Right.  Matter of fact, on the first accusal of

14  me sleeping on the job, they had it on camera, and they

15  transferred it over to his office.  And he looked at it,

16  and he says, that man ain't sleeping.  And so like I

17  said, they couldn't go back and use the camera again, so

18  they used him.

19    Q    Now, you mentioned an incident involving

20  Mr. Hixon where he reviewed a tape.  That was at -- that

21  wasn't at Google, that was at a different assignment;

22  right?

23    A    No, that was at Google.

24    Q    Was that -- because Mr. Penifold's complaining

25  here on July 21st, 2006.

1    A    Right.  Well, this incident here --

2    Q    What incident are you referring to where

3    Mr. Hixon actually looked at some tapes?

4    A    That was the first complaint with the EEOC.

5    Q    When did that -- when did that incident occur?

6    A    I don't know offhand.  I do know that they --

7    that they -- they transferred through -- they --

8    Mr. Hix -- somehow they took the computers at Googles,

9    and I guess they -- they -- they put it in there, and

10   he -- so he was looking at it on his computer in the

11   office.

12   Q    Well, did -- did Jennifer -- I'm sorry.  Did

13   Carlos Garcia also report to Mr. Hixon?

14   A    Yes.

15   Q    Did you ever -- and I want to look back at

16   Exhibit 12 here.  So Mr. Penifold complained to

17   Turner -- Ms. Turner about you on July 21st, '06?

18   A    Right.

19   Q    And did you ever -- and it looks like

20   Ms. Turner forwarded the e-mail to Hixon and Garcia?

21   A    Right.

22   Q    Did you ever speak to either Mr. Hixon or

23   Mr. Garcia about this incident?

24   A    I could have.  I'm not sure.

25   Q    You don't recall if you did?

1     A     I don't recall.  But like I said, I was on

2     camera, and therefore, if I was sleeping, they had it on

3     camera.

4     Q     Well, but you don't know whether they reviewed

5     the camera; correct?

6     A     Yes, they were reviewing -- they was watching

7     me the entire time.

8     Q     But you don't -- no one ever came to you and

9     said, we were watching you on camera on July 21st;

10    right?

11    A     Yes, the person who brought me the batteries

12    says, hey, we -- well, I knew they was watching me.

13    Since I filed that first, they was watching me the

14    entire time.

15    Q     But no one ever came to you and said, we were

16    watching you on July 21st; correct?

17    A     No.

18    Q     Okay.  And -- and let me ask you -- let me

19    introduce another --

20    A     And I would like to add that --

21    Q     There's actually no question pending right now.

22    A     Oh.

23    Q     Okay.  Let me hand you this.

24          (Defendant's Exhibit No. 13 was marked.)

25    BY MR. FERGUSON:

1      Q    And I've handed you Exhibit 13.  Please let me

2  know when you've had a chance to review that.

3      A    Yes, this is what I was saying.

4      Q    Okay.  Who is -- well, I've handed you what

5  we've marked as Exhibit 13.  Have you seen this document

6  before?

7      A    No.

8      Q    Who is Tammy Love?

9      A    I don't have no idea.  They could have been

10  there.  I don't know.

11     Q    Toward the top of this document, it says, list

12  persons involved, and it says SO Love.  Is that Security

13  Officer Love?

14     A    Clark, I remember her.  These are yes-people

15  for Ms. Turner.

16     Q    So SO Clark, that was another security officer

17  on assignment at Google?

18     A    Yes, she's a female.

19     Q    Okay.  And do you recall a security officer at

20  Google named Tammy Love?

21     A    No.

22     Q    And Wackenhut guards are not supposed to work

23  18-hour shifts; right?

24     A    That's -- that's what I had mentioned.  I was

25  supposed to have been relieved.  When I called up for a

1    battery --

2        Q    Is that -- but Wackenhut guards are not

3    supposed to work 18-hour shifts; correct?

4        A    No.

5        Q    That's correct?  That's right?

6        A    Right, that's correct.

7        Q    Did Ms. Turner tell you not to work 18 hours

8    straight on July 21st?

9        A    She was the one that refused to send somebody

10   to relieve me.  But that's correct.  In other words,

11   this was supposed to been something where she told me

12   don't work 18 hours.  And after the 16 hours when I

13   called up for a battery, the person came and brought me

14   the battery, but they didn't relieve me.

15       Q    So on July 21st you got to work at midnight

16   that day; is that right?

17       A    Probably.  Yeah, I was working there at

18   midnight.

19       Q    And you worked 18 hours until 6:00 p.m.?

20       A    Well, I had a choice, either I worked those

21   extra two hours or I just could have walked off the

22   post, which would have been deserting the post.  And

23   this is what they was trying to create.  They was trying

24   to create that astigma [sic] to try to get me to walk

25   off the post.

1     Q    But you worked 18 hours that day?

2     A    If I have no -- if you don't have no relief,

3  you got to work it, or you can walk off the post.

4     Q    And, Mr. Jones, if you could just try to answer

5  my question.

6     A    Uh-huh.

7     Q    So you worked 18 hours on July 21st?

8     A    That's correct.

9     Q    And you were paid for working 18 hours?

10    A    I don't know whether she took the two hours or

11  not.  I don't even know.

12    Q    But you're not alleging -- well, you have no

13  reason to believe that you weren't paid for working 18

14  hours that day; right?

15    A    I don't know.  The leads with the -- the whole

16  thing was that it was getting to be a hostile

17  environment.  She was creating a hostile environment for

18  me.  So whether they paid me or not, it wasn't the

19  point.  The point -- my point was that I had a choice,

20  either, as she say, don't work 18 hours, but if you

21  don't send me a relief -- so what that means, for me to

22  walk off the job and desert my post or me to stay.  So I

23  don't know what she did.  I didn't even pay that no

24  mind.

25    Q    And you're not alleging in this lawsuit that

1    Wackenhut failed to pay you for working 18 hours that

2    day; right?

3        A    Oh, I don't -- no, that has nothing to do with

4    it.

5             (Defendant's Exhibit No. 14 was marked.)

6    BY MR. FERGUSON:

7        Q    And I've handed you a copy of Exhibit 14, which

8    is a -- appears to be a memo from Jennifer Turner.  I'll

9    give you some time to read that.  Let me know when

10   you've --

11       A    No, I don't have to read it.  This is all just

12   made-up stuff that they made.

13       Q    And you produced a copy of this to me during

14   the lawsuit; right?

15       A    Did I?

16       Q    Have you seen this document before?

17       A    I don't recall.

18       Q    You don't recall whether you've seen Exhibit 14

19   before?

20       A    This one here (indicating)?

21       Q    Yes.

22       A    No, I don't recall I seen this before.  I could

23   have, but I don't -- I don't recall seeing this before.

24       Q    And about a third of the way down on the first

25   page, it says:  I instructed USO Donald Jones on the

1  date of July 18th. Do you see that?

2      A    I take your word for it. It could be that.

3  About working that 18 hours?

4      Q    Well, I'll show you. I'm looking at a certain

5  sentence. I'm trying to read upside down. I'll just

6  put a -- starting with that sentence right there

7  (indicating). Could you read for me that sentence that

8  I started to underline?

9      A    I instructed USO Donald Jones on the date of

10  July 18, 2000 [sic], that he must have a relief person

11  on the date of 7/21 because he could not work Post 10,

12  okay, 18 hours. It sounds very confusing to me, because

13  if I got to have a relief person, then it's her -- it's

14  her job to send me a relief person. Now, I can see if

15  she told -- if she sent somebody to me and I refused to

16  leave. But where was my relief person?

17      Q    Well, then the next sentence, she says: USO --

18  what does USO stand for first?

19      A    I don't know what that stands for.

20      Q    It says: USO Donald Jones stated Ms. Obende is

21  relieving me, so I will go home at the proper time. Who

22  is Ms. Obende?

23      A    I don't know.

24      Q    So do you deny that you told Ms. Turner that

25  someone named Ms. Obende was going to relieve you?

1    A    No, I can't have no -- she has to tell the

2    person to relieve me. I can't order a person to relieve

3    me.

4        And that's what I want to bring up, that this

5    Post 10, I'd like to know how Mr. J.C. Pittman [sic]

6    know about Post 10, because that's Wackenhut's terms.

7    That's not his terms. We had nothing to do with this

8    guy.

9    Q    So Ms. Obende did not relieve you on July 21st?

10    A    Nobody relieved me.

11    Q    And that's why you worked 18 hours straight

12    that day?

13    A    That's correct.

14    Q    And July 21st is the day we're talking about;

15    right?

16    A    Right.

17    Q    And that was the day that Mr. Penifold

18    complained about you?

19    A    That's correct.

20        (Defendant's Exhibit No. 15 was marked.)

21    BY MR. FERGUSON:

22    Q    And, Mr. Jones, I've handed you Exhibit --

23    A    Uh-huh.

24    Q    -- 15 here. I'll give you some time to look

25    over that exhibit. Just let me know when you've had a

1   chance to look at it.

2       A       I don't even remember signing nothing like

3   that.

4       Q       You're talking about Exhibit 15?

5       A       Yeah.

6       Q       Is that your signature appearing at the bottom

7   of this exhibit?

8       A       Yeah.

9       Q       And do you recall Jennifer Turner giving you

10  this reprimand?

11      A       No.

12      Q       And she's reprimanding you for unacceptable

13  behavior at Google; correct?

14      A       What -- Tammy Kelly [sic], that was her pet.

15  She was forced to fire him for punching out one of the

16  females on the job.

17      Q       My question was:  In this reprimand dated

18  May 12th, Ms. Turner is reprimanding you for

19  unacceptable -- what she says, unacceptable behavior

20  publicly at the Google facility?

21      A       I don't recall this.  I don't know how they

22  could have got my signature on something like this.

23  They must have took it off of something else and put it

24  there.

25      Q       So you deny that you were ever receive -- that

1    you ever received this employee reprimand?

2        A    Right, because I don't sign things.

3        Q    So it's your testimony as you sit here today

4    that this reprimand was never given to you?

5        A    Yes, I don't believe so.  I don't believe -- I

6    don't recall this at all.

7        Q    Do you ever remember conversing with Ms. Turner

8    in May of 2006 about a violation of Policy No. 2.7?

9        A    No, I never heard -- I never even heard of

10    Policy No. 2.7.  To me, I think they trumped this up.

11    They -- somehow they got my -- they Xeroxed themselves

12    and got my signature on here.  Where is the original

13    one?

14        Q    I don't have the original with me.

15        A    Yeah, I would like to see the original one.

16            (Defendant's Exhibit No. 16 was marked.)

17    BY MR. FERGUSON:

18        Q    I've handed you Exhibit No. 16.  After you've

19    had a chance to review that, please let know.

20        A    I don't see any signature on here.  To me, this

21    is something that she just wrote up.

22        Q    Have you seen this document before?

23        A    I don't -- I don't believe so.

24        Q    Do you recall being late to work on July 15th

25    of '06?

1        A    No.

2        Q    Was there ever an occasion where you took

3    codeine and that caused you to oversleep and be late to

4    work?

5        A    Codeine?

6        Q    Yes.

7        A    No.

8             How come my signature is not on here?

9        Q    Do you recall Jennifer Turner ever having a

10   conversation with you where she was upset with you

11   because you hadn't given her four hours' notice that you

12   were going to be late?

13       A    Bluntly, Jennifer Turner is a liar.

14       Q    And that's not my question.  Do you recall

15   ever --

16       A    No.

17       Q    -- having a conversation --

18       A    No.  If I --

19       Q    If you'd let me finish my question.

20       A    Okay.

21       Q    Do you recall ever having a conversation with

22   Ms. Turner in July where she was upset that you hadn't

23   given her four hours' notice that you were going to be

24   late?

25       A    No.  If there was, it would've had to been the

1  same as this one here, an employee's recommend [sic].

2  This looks like something that she just wrote.

3  There's -- there's nothing on here that says otherwise

4  outside of the fact that she just wrote that on a piece

5  of paper and put a date on it.

6      Q    The last day of your Google assignment was

7  July 21st, 2006; correct?

8      A    Oh, I don't know offhand.

9      Q    Okay.  I'm looking at -- well, the e-mail that

10  we've looked at from Mr. Penifold and the final warning

11  that you were given, do you recall testifying about both

12  of those?

13     A    The final warning?  Right.

14     Q    Yes.

15     A    I wrote my answer, and they wrote their answer.

16     Q    Right.  And the final warning was given to you

17  as a result of an incident that occurred on July 21st?

18     A    Yes, the false statements by J.C. Penman [sic].

19     Q    And you didn't work any other days -- you

20  didn't work any other days at Google after July 21st?

21     A    Well, they suspended me for three days.

22     Q    But is that -- so you didn't work any days at

23  Google after July 21st?

24     A    No.

25     Q    So after Mr. Penifold submitted that e-mail,

1    you didn't work any more days; right?

2        A    Not at Googles.

3        Q    Do you know who replaced you at Google?

4        A    No.

5        Q    And I want to back up to Exhibit 11 for a

6    second.  It's the final warning.

7        A    Okay.

8        Q    I'm looking, Mr. Jones, in the section that's

9    marked corrective steps required.  Do you see that about

10   halfway down the page?

11       A    Actions will be taken if issues is not

12   corrected.

13       Q    Just above that, the section just above that.

14       A    Okay.

15       Q    Corrective steps required.  In the second

16   sentence there, could you read that sentence for me that

17   starts as per the client's request?

18       A    As per the client's request, you will be

19   removed from Google's stall [sic] and reassigned.

20       Q    From the Google site?

21       A    Yeah.

22       Q    And is it your understanding that Google

23   instructed Wackenhut to end your assignment?

24       A    That's correct.

25       Q    And you don't know who decided to end your

1    assignment at Google; right?

2          A      Yes, J.C. Penman [sic].

3          Q      So Mr. Penifold decided to end --

4          A      That's correct.

5          Q      And you don't know whether any Wackenhut

6    employees were involved with that decision; correct?

7          A      Yes, I do.  Jennifer Turner was involved in it.

8          Q      Okay.  And you were not present in any meetings

9    between Ms. Turner and Mr. Penifold about the ending of

10   your assignment; right?

11         A      Right.

12         Q      And so it's your -- you're just speculating

13   that you think Ms. Turner was involved; correct?

14         A      No, sir, I don't.  I know for sure she was.

15         Q      How do you know for sure that Ms. Turner was

16   involved with that decision?

17         A      When I filed that first complaint about her,

18   she was making a hostile environment throughout.  When I

19   came -- I think I was leaving that evening, and then one

20   of the -- I think it was this Ms. -- this Love lady, she

21   was the one that said, Ms. Turner wants to see you.  So

22   I went back to her office, and Ms. Turner says, no, I

23   don't want to see him.

24                When I came back that night at eleven o'clock,

25   that's when she -- it was on a Friday.  That's when she

1   told me about this incident and says, well, we -- now

2   you have to report to the office on Tuesday.

3       Q    And what day of the week was July 21st, if you

4   remember?

5       A    The day, that was on a Friday.

6       Q    So that was on a Friday?

7       A    Right.

8       Q    So the sleeping incident occurred on a Friday?

9       A    Oh, I don't know what day that -- that incident

10  happened.  But I know -- do know that the reason why --

11  she had told the employees there what she was going to

12  do ahead of time, and that's when Ms. Love took me back

13  there, and says, okay, you want to see Donald Jones,

14  he's here.  And she said, no.

15          The reason why she said no was because if they

16  was going to discipline me then I could have went

17  straight to the office then.

18      Q    Well, you -- and let me just -- you were not

19  present in any meetings between Mr. Penifold and

20  Ms. Turner where they were discussing the ending of your

21  assignment; right?

22      A    No.  Her actions spoke for herself.  She's

23  very -- was vague with what she was doing.

24      Q    And you don't even know whether any meetings of

25  that nature occurred; correct?

1    A    They had to -- they had to discuss it.  It

2  stands to reason they have to discuss it.  Here he says

3  Post 10.  This man knows nothing about Post 10.

4    Q    But you don't know whether they actually even

5  conducted a meeting to discuss --

6    A    I think there's merit to say that they did.

7    Q    But you don't know for sure; right?

8    A    I believe that the facts will point to the fact

9  that there was some type of conversation between these

10  two.

11    Q    I understand.  But you don't know for sure

12  whether Ms. -- Mr. Penifold and Ms. Turner had a meeting

13  of that nature to discuss the ending of your assignment;

14  right?

15    A    I can only say that I will bring forth that as

16  that they did.  They did have that meeting.  I think the

17  evidence states that they did.

18    Q    And you weren't present at that meeting;

19  correct?

20    A    No, sir, I was not.  I think the merit of --

21  the coincidence of what -- what happened shows proof and

22  merit that they did have a meeting.

23    Q    So that's just your personal belief?

24    A    And that's what I base that lawsuit on.

25    Q    Right.  But you -- other than that personal

1    belief, you don't have any other proof that they sat

2    behind closed doors and conducted that meeting; right?

3        A    No.

4        Q    And you don't know -- and if they did conduct a

5    meeting, you don't know what they discussed during that

6    meeting; right?

7        A    Yes, I do.  I believe they did discuss to

8    remove Donald Jones from this point.  The point was

9    to -- was to fire me.  And this was the first step in

10   doing so.

11       Q    But that's just your -- your personal belief

12   that that's what --

13       A    Well, that's what they -- that's what they did.

14       Q    Well, no one ever came to you after a meeting

15   of that nature and told you what was discussed; right?

16       A    Well, it says it right here, basically here in

17   the writing what it was, and it just shows that they

18   was -- well, there had to be a conversation between

19   Jennifer Turner and this man right here based on these

20   statements right here.

21       Q    And, Mr. Jones, no one ever came to you and

22   told you what was discussed at any meeting between

23   Ms. Turner and Mr. Penifold about the ending of your

24   assignment; correct?

25       A    I think the -- the final warning and the memos

1  that was sent, I think it all points to the fact that

2  they did have a conversation and what they reasons was.

3      Q    That's not my -- my question is simpler than

4  that.  My question is:  No one came to you and told you

5  that -- or told you what was discussed in a meeting of

6  that nature?

7      A    No.

8      Q    Right.  And you testified a minute ago that you

9  don't -- you think that a meeting occurred between

10  Mr. Penifold and Ms. Turner, but you're not exactly

11  sure; right?

12      A    Yes, I am.

13      Q    You testified a minute ago that it's your

14  belief that a meeting of that nature occurred, but you

15  don't know for sure whether Mr. Penifold and Ms. Turner

16  actually met to discuss the ending of your assignment?

17      A    No, I believe -- I think the merit shows that

18  they did.  I think the memos and everything points to

19  the fact that there was a conversation between

20  Mr. Penifold and Ms. Turner.

21      Q    What date did that meeting occur?

22      A    I couldn't tell you what date.  It must have

23  been on -- well, the date of her first -- of his memo.

24      Q    And you don't know whether -- I understand you

25  believe that a meeting like that occurred.

1    A    Okay.  July 21st.

2    Q    Okay.  And I understand that you believe

3  that -- or you think that they met, but you actually

4  didn't see Ms. Turner and Mr. Penifold meeting to

5  discuss your assignment, did you?

6    A    No, I did not see them.

7    Q    And you don't know the reasons that were

8  discussed by them in making the decision to end your

9  assignment; correct?

10   A    No, the fact was that they -- they were -- they

11 did have a conversation to have me removed from the

12 site, and that's exactly what they did.

13   Q    And you don't know what they -- or what reasons

14 that Mr. Penifold gave Ms. Turner if that meeting ever

15 occurred; right?

16   A    Yes.  The -- the meeting was that I was

17 sleeping on the job.

18   Q    So that was the reason that Mr. Turner --

19 Mr. Penifold gave to Ms. Turner?

20   A    That's correct.

21   Q    Who told you that your Google assignment had

22 been ended?

23   A    Ms. Turner.

24   Q    And was that in a face-to-face meeting?

25   A    Yes.  As I said, they called me into the office

1  earlier that day, and she stated, no, I don't want to

2  see him.  Then when I came back that evening, that's

3  when she told me.  And I'm under the belief she did that

4  because the office was closed and now -- and then the

5  office was closed, so they didn't want the matter

6  resolving.  Then she told me to show up in the office

7  Tuesday, which I said they suspended me for those three

8  days.

9      Q    When did you meet with Ms. Turner?  What date?

10  If this incident occurred on July 21st, what was the

11  date that you met with Ms. Turner where she told you

12  that your Google assignment had been ended?

13      A .  I can't say.  I say it was on a Friday.

14      Q    So was it the same day of this incident, or was

15  it the next day?

16      A    It could have been the next day.

17      Q    Where did that meeting take place?

18      A    In her office.

19      Q    Ms. Turner's office?

20      A    Yes.

21      Q    Who else was present for that meeting?

22      A    Mr. Godfrey.

23      Q    And who is that?

24      A    Godfrey.

25      Q    Burkeley Godfrey?

1    A    That's correct.

2         He -- I think they just -- for his part in

3    this, she promoted him, I think, within that same day.

4    Q    And what was his job title?

5    A    He was a security officer just like me up until

6    that day.  Then they make him out of a supervisor.

7    Q    And tell me everything that you said to

8    Ms. Turner during that meeting.

9    A    Oh, I couldn't say.  I know she told me what

10   Mr. Peniwer [sic] -- what Mr. Penifold said, and I

11   denied it.  I called her, you know, and said that he was

12   lying, which is exactly what he was.

13   Q    So what did -- to your recollection, what did

14   Ms. Turner -- what were her exact words to you during

15   that meeting?

16   A    Oh, I don't know what her exact words was.  But

17   I do think --

18   Q    Or what was the gist of what she told you?

19   A    She just said that he saw me sleeping on the

20   job.  And I -- of course, I denied it.  I called him a

21   liar, which he was.

22   Q    So she said that she had received a complaint

23   from Mr. Penifold about you?

24   A    Well, I knew that she didn't -- she didn't

25   really receive a complaint.  It was a setup.

1      Q    And what proof do you have that this was a

2   setup?

3      A    Because the whole thing was a lie.

4      Q    But no one has ever come to you and told you

5   that you were being set up; correct?

6      A    It had to be a setup because I wasn't sleeping

7   at the time.

8      Q    So you think this was a setup because you deny

9   that you were sleeping on the job; right?

10     A    No, it was a setup because I had filed charges

11  against Jennifer Turner and Wackenhut.

12     Q    But as you sit here today, you admit that

13  Ms. Turner received a complaint from Mr. Penifold that

14  you were sleeping on the job; correct?

15     A    I don't believe it was a complaint.  I think it

16  was a setup.

17     Q    You testified earlier -- I asked you during the

18  deposition whether you were aware of any complaints that

19  Wackenhut had received about you, and you testified that

20  you were aware of a complaint that Wackenhut received

21  from Mr. Penifold about you sleeping on July 21st.

22     A    That's -- yes, that's correct.  That was --

23  that was a setup between Ms. Turner and this -- and this

24  gentleman right here.  And it was a retaliation.

25     Q    And we'll get into that.  I definitely want to

1  discuss your retaliation claims in more detail. So

2  we'll get into that.

3          Tell me everything that -- other than

4  Ms. Turner telling you what Mr. Penifold had told her

5  about the sleeping, what else did Ms. Turner tell you

6  during that meeting?

7      A   The only thing I can vaguely remember, she says

8  report to the office on Tuesday, and this was a Friday.

9      Q   Was that the Wackenhut corporate office in

10 Marietta?

11     A   That's correct.

12     Q   What else did she say to you during that

13 meeting?

14     A   That's about it.

15     Q   What did Mr. Godfrey say during that meeting?

16     A   He was just there as -- excuse the expression.

17 He was there as a flunky, just basically the -- to -- to

18 do whatever Ms. Turner said, as a witness. He was just

19 --

20     Q   So he didn't say anything?

21     A   No, he was just promoted, I think, that day, if

22 not the day before, to a supervisor and just for that

23 reason.

24     Q   What do you mean by that?

25     A   In other words, just to be a witness.

1          Mr. Godfrey was having trouble with child

2     support.  I think his salary was being garnishee.  And I

3     believe there must have been some type of deal of giving

4     him a lot of overtime or just not no longer recognizing

5     his garnishee, because sometimes Wackenhut does that.

6     Even though your salary is garnishee, they may not honor

7     it.  And I think they -- there was something in the

8     works, because he was being very pressured as far as

9     finances is concerned.

10         Q     What is his race, Mr. Godfrey?

11         A     He's black.

12         Q     What is his age?

13         A     30, 35.

14         Q     And so you think in July of 2006 he was

15    promoted?

16         A     Yes, he was.  Matter of fact, I know.  Him and

17    I, we -- we worked the same posts.  We talked.  And

18    that's how I know his personal business about him

19    being -- his salary being garnished for child support.

20         Q     And it's your testimony that he didn't say

21    anything during the meeting with you and Ms. Turner

22    about the ending of the assignment; right?

23         A     Not that I can remember.

24         Q     And what else did -- or what did you tell

25    Ms. Turner during that meeting?

1     A    She accused me.  She said this man accused me

2  of sleeping, and I denied it.  I told them he was a

3  liar.

4     Q    What else did you say during that meeting to

5  Ms. Turner?

6     A    Oh, I don't know.  That's -- that's it.

7     Q    How long did that meeting last?

8     A    It didn't last long.  Maybe five minutes, ten

9  minutes.

10    Q    Other than what we've already discussed, do you

11  recall anything else that you said or that Ms. Turner

12  said during that meeting?

13    A    Only whatever she accused me of, I denied it,

14  and I made myself clear that this man was a liar.

15    Q    That Mr. Penifold was a liar?

16    A    That's correct.

17    Q    Other than Ms. Turner, did you speak to anyone

18  else at Wackenhut about the ending of your Google

19  assignment?

20    A    No.  As soon as that happened, I left the

21  premises.

22    Q    How about, you said that she asked you to

23  report to the office the following Tuesday?

24    A    That's correct.

25    Q    Did you do that?

1    A    Yes.

2    Q    When you were at the office, who did you meet

3 with?

4    A    Ms. Kirby and -- I think it was Ms. Kirby, and

5 it was -- it could have been Gonzalez, but it was

6 definitely her.

7    Q    And did you discuss the ending of your Google

8 assignment with either Ms. Kirby or Ms. Gonzalez, or

9 were you just discussing your next assignment?

10    A    No, we was discussing the assignment at

11 Googles.  She wrote her recommend [sic].  She told me if

12 I wanted to, I could write an answer of denial if I

13 wanted to, which I did.

14    Q    Ms. Kirby said that?

15    A    Yes.

16    Q    And what do you mean by an answer of denial?

17    A    The statements that they wrote here was they

18 opinion.  This is what they said.

19    Q    Right.

20    A    And I wrote an answer to her saying that

21 Mr. Godfrey, Ms. Turner, and this guy Penifold, that the

22 three of them lying.

23    Q    Ms. Turner never told you that she saw you

24 sleeping on the job on July 21st; right?

25    A    Well, she couldn't.

1    Q    Why is that?

2    A    Because I had brought charges against her.  It

3    would look too obvious.

4    Q    Well, she wasn't -- was she on assignment on

5    July 21st at --

6    A    Yes, she was.  She was watching me on camera.

7    Q    How do you know she was watching you on camera?

8    A    When that lady brought me the -- the battery,

9    she says, we watching you on camera.  Then I know that

10   they was watching me on camera.  She was creating a

11   hostile environment the entire time, as she created that

12   18 hours.

13   Q    A hostile environment based on what?

14   A    Harassment.

15   Q    Was she harassing you based on what, though?

16   A    Explain to me what you mean.

17   Q    Well, you said the word "harassment."

18   A    That's right, with the 18 hours; by not sending

19   somebody there to relieve me; told me, you can't work 18

20   hours; fine, therefore, send somebody to relieve me.

21   Q    So the hostile environment existed because she

22   didn't send somebody to relieve you?

23   A    And there was other types of harassment that

24   she -- she was doing.

25   Q    What other types of harassment?

1    A    Right now these four statements that we've got

2  here right now.

3    Q    And what -- what do you believe was the nature

4  of her harassment?

5    A    One was that 18 hours.

6    Q    Okay.  Do you allege that she was harassing you

7  based on your race?

8    A    Ms. Turner?

9    Q    Yes.

10   A    She was harassing me because I filed charges

11  against her.  This was the second set of charges I filed

12  against her.

13   Q    Okay.  So you mean retaliation then?

14   A    That's correct.

15   Q    Okay.  So when you were talking about

16  harassment, all the harassment that you've been

17  discussing is really the -- what you believe was

18  retaliatory actions that Wackenhut took against you?

19   A    That's correct.

20   Q    Okay.  And like I said, we'll have plenty of

21  time to talk about the retaliation, so I will definitely

22  have questions about that.

23        At some point do you want to take a lunch

24  break.  How about you, are you hungry now?  Do you want

25  to take a lunch right now?

1    A    How long are you going to be?

2    Q    I probably got -- I'm probably almost halfway

3    done, I'd say.

4    A    Okay.  Well, let's go on.  We good.

5    Q    Why don't we go for another 10, 15 minutes and

6    take a lunch break.  How about that?

7         And you claim that you were suspended from your

8    Google assignment based on your race and age; is that

9    correct?

10   A    That's when she told me to come back to the job

11   on that Tuesday.  She suspended me for those three days.

12   Q    But do you claim that you were suspended based

13   on your race and age?

14   A    Discrimination, yeah.  Retaliation and

15   discrimination, yes.

16   Q    And when -- strike that.

17        Do you contend that the suspension occurred

18   following the incident, or after the incident, where

19   Penifold complained about you sleeping?

20   A    Right afterwards.

21   Q    And the sleeping incident was July 21st;

22   correct?

23   A    Uh-huh.

24   Q    And what were the dates that you were

25   suspended?

1        A      That Friday, Saturday, and Monday, I believe.

2   Because those was my days that I worked.

3        Q      So would that have been July 22nd, 23rd, and

4   24th?

5        A      Right.  I know there was three days there.

6   Between those four days, they was -- between Friday,

7   Saturday, Sunday, and Monday, I worked three of those

8   days, so I was -- I was -- I lost three days' pay.

9        Q      So from what assignment were you suspended?

10       A      From Googles.

11       Q      Well, how were you suspended from the Google

12  assignment if your assignment ended there on July 21st?

13       A      My assignment there didn't end officially until

14  I got to the office.

15       Q      I thought you testified a minute ago that

16  Ms. Turner met with you to end your assignment at --

17       A      She can't --

18       Q      -- Google?

19       A      Officially, she can't terminate a person.  You

20  have to -- it goes through the office.  But she told me,

21  don't come back to work.  So that's what she did.  Not

22  until I go to the office.  And she could have done that

23  in the morning, that afternoon.

24       Q      Do you know when she received Mr. Penifold's

25  complaint about -- or received Mr. Penifold's

1  instruction to end your assignment?

2      A    No, I don't know personally.  I think during

3  these -- she says here 5:13 p.m, July 21st.

4      Q    Okay.  So that's when -- in your opinion,

5  that's Mr. -- she received Mr. Penifold's instruction?

6      A    That's correct.

7      Q    Do you claim that your Google assignment was

8  ended based on your race and age?

9      A    Yes, I believe, because Mr. Pennen [sic], to

10 me, he's a racist.

11     Q    And who do you contend discriminated against

12 you based on your race?

13     A    Based on the race?  Mr. Penifold.

14     Q    Okay.  And other than Mr. Penifold, are you

15 contending that any other Wackenhut or Google employee

16 has discriminated against you based on your race?

17     A    Oh, yes.  I can say Ms. Turner.  There is black

18 on black racism.  It's very alive here in Georgia.

19     Q    Other than Mr. Penifold and Ms. Turner, do you

20 contend that any other --

21     A    I --

22     Q    -- Wackenhut or Google employees discriminated

23 against you based on your race?

24     A    I couldn't say.  But I could know that those

25 two was the immediate people involved.  And since they

1   knew about it and they didn't stop it, they just as

2   guilty.

3      Q    What is Mr. Penifold's race?

4      A    He's white.

5      Q    How did he allegedly discriminate against you

6   based on your race?

7      A    He agreed to lie.

8      Q    And what do you mean by that?

9      A    I mean by telling that false statements that I

10   was sleeping on the job.

11      Q    What else did he do that was discriminatory --

12   well, what other facts do you have to support your

13   belief that Mr. Penifold discriminated against you?

14      A    He lied.

15      Q    Other than your belief that he lied --

16      A    He did lie.  I wasn't sleeping.

17      Q    I understand you dispute that.

18      A    Right.

19      Q    But other than your dispute about whether you

20   were sleeping or not, what other facts do you have to

21   support your belief that Mr. Penifold discriminated

22   against you?

23      A    That's enough.  He lied.

24      Q    Okay.  So no other facts?

25      A    Outside the fact, right.  He's a -- he's a

1  liar.

2      Q    And you testified that you never met with

3  Mr. Penifold about the ending of your assignment; right?

4      A    No, not at all.

5      Q    And so you're not alleging that he made any

6  racist comments to you; right?

7      A    I wasn't there.  I couldn't have heard it.

8           But Mr. Penifold is a southern white, and....

9      Q    But you're not -- my question is:  You don't

10 allege that he made any racist comments to you; correct?

11     A    I never heard any racist comments come from

12 him.  I never even spoke to him.

13     Q    And Ms. Turner never made any racist comments

14 to you; right?

15     A    Who?  Mrs. -- her actions speaks for -- for

16 herself.

17     Q    But you never heard Ms. Turner make any racist

18 comments to you; correct?

19     A    How could -- I don't believe -- how was she

20 going to make racist comments?  Her actions speak for

21 herself.

22     Q    And that's -- my question is simpler than that.

23 You're not alleging that Ms. Turner used any racially

24 inappropriate or made any racially inappropriate remarks

25 to you; right?

1      A   Outside of her actions, no.

2      Q   Okay. And did you complain to anyone at

3  Wackenhut that you had been discriminated against based

4  on your race?

5      A   I filed the charge there. That -- the charge

6  that I filed with the EEOC spoke for itself.

7      Q   Okay. And do you know whether Wackenhut took

8  any steps to investigate your complaint --

9      A   No, they didn't.

10     Q   -- your discrimination complaint?

11     A   They didn't do anything about it.

12     Q   But you don't -- Wackenhut could have

13 investigated it, and you wouldn't have knowledge of it;

14 correct?

15     A   That's correct. Matter of fact, if they would

16 have investigated it, it probably -- you and I wouldn't

17 be sitting here right now.

18     Q   But you don't know that the steps that

19 Wackenhut took --

20     A   They didn't do anything.

21     Q   Well, Wackenhut submitted a position statement

22 to the EEOC; correct?

23     A   Outside of that, yes.

24     Q   And you don't know what steps they took -- what

25 investigative steps they took as they were drafting that

1    position statement; right?

2    A    Yes, I have all the papers that were sent in to

3    Wackenhut.

4    Q    Right.  But my question is a little different

5    than that.  You don't know -- as they were drafting

6    their position statement to the EEOC, you don't know

7    what steps they took to investigate your charge;

8    correct?

9    A    They didn't take anything, because Ms. Turner,

10   she just continued to create a hostile environment.  So

11   evidently, they didn't take any steps.

12   Q    Well, that's your personal belief; correct?

13   They could have -- Ms. Kirby or someone else could have

14   taken steps, and you just wouldn't have knowledge of

15   those?

16   A    No, I'm not -- I don't believe that.  I don't

17   believe that -- they didn't do anything.  In fact,

18   Ms. Kirby is even part of -- was part of the problem.

19   Q    I'm going to ask it again.  We'll sit here all

20   day.  I'll ask it all day long.

21   A    Go on.  Don't make no difference.

22   Q    We can sit here all day.

23   A    All right.  No problem.

24   Q    You don't know what steps Wackenhut took to

25   investigate your complaint of discrimination?

1     A     You are saying that Wackenhut was doing

2  something to -- to better the problem.  And, no, they

3  did not attempt to better the problem or to solve the

4  problem.  They did nothing.

5     Q     No one from Wackenhut ever came to you and

6  said, we didn't investigate your complaint, did they?

7     A     No.

8     Q     So it's possible that they conducted some form

9  of investigation on your complaint; right?

10    A     I can't say that, because they would have told

11 me.  I mean, how I'm going to say that they invisibly

12 did something when they didn't do anything?  And if they

13 would --

14    Q     But you have no idea what they did behind

15 closed doors to investigate your complaint; correct?

16    A     I can't -- I can't live with that.  I don't

17 believe that Wackenhut did anything.  I think it

18 directly speaks for itself that they did nothing because

19 Ms. Turner still continued to create a hostile

20 environment.

21    Q     You don't know whether Wackenhut -- any

22 Wackenhut employees ever met to discuss your race

23 discrimination complaint, do you?

24    A     You mean a grievance.  If there was a

25 grievance, they would have called me to they office.

1      Q    Mr. Jones --

2      A    Uh-huh.

3      Q    -- please -- we're going to be here till

4  midnight if you don't answer my questions.

5      A    No, we're not going to be here till midnight.

6      Q    Yes.

7      A    I'm saying --

8      Q    We'll --

9      A    No.

10     Q    We'll be here tomorrow.  We'll be here all

11  week.

12     A    No, we won't.

13     Q    Yes, we will.

14     A    No, we won't.

15     Q    You're going -- this process is going to be a

16  lot --

17     A    You are one -- you want me to say that behind

18  closed doors that Wackenhut could have been working

19  behind closed doors to investigate it and to resolve

20  this matter, and I'm under the -- and they did not.

21     Q    But you have no way of knowing that?  How could

22  you possibly know that they didn't conduct an

23  investigation when you weren't even there --

24     A    When --

25     Q    -- at the office?

1    A    Because the harassment did not stop.  It

2   continued.

3    Q    And I'm going to say it again.  You filed a

4   charge of race -- well, strike that.

5        So you never submitted an internal complaint to

6   Wackenhut about race discrimination; correct?

7    A    Not an intern.  I did it with the EEOC.

8    Q    Other than what we've already discussed, are

9   there any other facts that you have that support your

10  belief that Mr. Penifold discriminated against you based

11  on your race?

12   A    Outside the fact that he was willing to lie on

13  a person, like he --

14   Q    You've already testified.  I don't --

15   A    Okay.  That's it.

16   Q    I don't want to get into --

17   A    All right.  That's it.

18   Q    So other than what we've discussed, you have no

19  other facts to support your belief that Mr. Penifold

20  discriminated against you based on your race; correct?

21   A    No.

22   Q    And other than what we've discussed, you have

23  no other facts to support your belief that Ms. Turner

24  discriminated against you based on your race; correct?

25   A    Right.

1    Q    Okay.  Who do you contend discriminated against

2  you based on your age?

3    A    Well, that's -- that -- if -- age

4  discrimination have to do with a person being over 40.

5  That's what age discrimination is.

6    Q    Well, who do you contend discriminated against

7  you based on your age?

8    A    If I'm over 40, then they all would have

9  discriminated against me based on age.

10    Q    Well, what I'm trying to find out is, when we

11  were talking about race discrimination --

12    A    Uh-huh.

13    Q    -- you listed two people who discriminated

14  against you based on your race, Mr. Penifold and

15  Ms. Turner; correct?

16    A    Right.

17    Q    And so I want to do the same thing for your age

18  discrimination complaint.  I want you to please tell me

19  who you believe discriminated against you based on your

20  age.

21    A    Well, Ms. Turner was getting rid of all the

22  older people on the job.

23    Q    So Ms. Turner was one?

24    A    Yes.

25    Q    And is there anybody else that you believe

1    discriminated against you based on your age?

2        A.    That's it.

3        Q     How -- how did Ms. Turner discriminate against

4    you based on your age?

5        A     Oh, she was removing all the people off the job

6    40 or over.  She was getting rid of us.  And she was

7    bringing in younger people 30 and under.

8        Q     So removing guards from the assignment?

9        A     That's correct.

10       Q     What guards beneath the age of 30 did she bring

11   in -- or beneath the age of 40 did she bring in?

12       A     Oh, I don't know.  I got the records.  I think

13   you got the records because you sent them to me.

14       Q     But as we sit here today, you can't identify

15   any -- any guards that she brought in below the age of

16   40?

17       A     I haven't been there in over two years.

18       Q     And how about -- so do you allege that she

19   ended your Google -- or that the Google assignment was

20   ended based on your age?

21       A     The Google assignment was based on multiple

22   reasons.

23       Q     Okay.  And was one of those reasons your age?

24       A     Yes.

25       Q     And other -- removal of other guards above the

1  age of 40, can you identify any other guards above the

2  age of 40 that were removed from Google by Ms. Turner?

3      A    Not off the -- not off the top of my head.  But

4  I think if -- the records will show that if you look at

5  the records of the people that was there during the time

6  that I was there that people were removed from that post

7  40 and over.

8      Q    But as we sit here today, you can't identify --

9      A    No.

10      Q    -- any of those people?

11      A    No.

12      Q    What facts do you have to support your

13  contention that Ms. Turner discriminated against you

14  based on your age?

15      A    Oh, that would be that she was removing people

16  from the job 40 and over.

17      Q    What other facts do you have to support your

18  belief that Ms. Turner discriminated against you based

19  on your age?

20      A    Well, that's what she was doing.  She wanted

21  younger people on the stall.

22      Q    Did she ever tell you -- she never told you

23  that she wanted younger people?

24      A    Her actions speak -- spoke for herself.

25      Q    But she never told you that; correct?

1      A   Of course not.

2      Q   So other than what we've discussed, what other

3 facts do you have that support your contention that

4 Ms. Turner discriminated against you --

5      A   Well, with the --

6      Q   -- based on your age?

7      A   Well, I've got to go to the interrogatories,

8 which I was trying to get to you, that showed that

9 within the period of time that she was removing people

10 40 and older.

11      Q   And I understand that. You've already --

12 you've already told me what you think about that.

13      A   Uh-huh.

14      Q   I'm talking about other than that, other facts

15 that you have to support your belief that Ms. Turner

16 discriminated against you based on your age.

17      A   She -- that's it. She was bringing in younger

18 people.

19      Q   Okay. Did you ever complain to anyone at

20 Wackenhut that Ms. Turner had discriminated against you

21 based on your age?

22      A   You don't make the complaints with Wackenhut.

23      Q   So the answer is no?

24      A   No.

25      Q   And you're not alleging that Ms. Turner made

1  any discriminatory or ageist comments to you; right?

2      A    Of course not.

3      Q    Okay.  And is it your opinion that your Google

4  assignment should not have been ended?

5      A    That's correct.

6      Q    Do you contend that Wackenhut discriminated

7  against you or that Google was wrong in ending your

8  assignment?

9      A    That's correct.

10      Q    Which one?

11      A    That -- repeat your question.

12      Q    Sure.  Do you contend that Wackenhut

13  discriminated against you or that Google was wrong in

14  ending your assignment?

15      A    Both.

16      Q    Both.  All right.  Well, I'm almost to a

17  stopping point discussing the discrimination claims.  We

18  can come back and discuss retaliation.  But let's

19  just -- let's finish this little section.

20          Other than what we've already discussed, is

21  there anything else that Wackenhut did that was

22  discriminatory, other than what we've already discussed?

23      A    Oh, what we've already discussed.  Well, yes,

24  in a basis they do.  They -- unless you -- as I

25  said -- which is one of the reasons why I was going to

1   end up leaving anyway, that unless you have a police

2   background or a military background they don't promote

3   you the same.

4       Matter of fact, I'm sure of it, that Wackenhut

5   was taking a union to court because the union was trying

6   to break they lines and make the -- the credit union

7   from Wackenhut, and Wackenhut needs the -- needs the

8   union in there.

9       Q    And you never complained to anybody at

10  Wackenhut that you were not being promoted because you

11  didn't have a military background; correct?

12      A    You don't make those complaints with companies

13  like this.

14      Q    And you didn't include that type of allegation

15  in your EEOC charges; right?

16      A    No.

17      Q    Other than what we've already discussed, are

18  there any other acts of discrimination that Wackenhut

19  took against you personally?

20      A    Outside of lies.

21      Q    And when you say "lies," you mean the lie --

22      A    Yes.

23      Q    -- what you believe --

24      A    The false report.

25      Q    What you believe that Mr. Penifold --

1     A    Penifold and --

2     Q    So the main act of discrimination is what you

3 believe to be Mr. Penifold's lie on July 21st?

4     A    And also the lies that the person at Sara Lee

5 did and Ms. Turner and also the lies that -- and

6 discrimination with the unemployment.

7     Q    And in the EEOC charges that you filed, you

8 never mentioned any alleged acts of discrimination that

9 occurred at Sara Lee; correct?

10     A    No, because nothing there really -- really

11 happened.

12     Q    And so other than what we've already discussed,

13 is there anything else that Wackenhut did that was

14 discriminatory?

15     A    Not outside of the fact of unemployment, denied

16 me unemployment.

17     Q    So you -- it's your belief that Wackenhut

18 denied you unemployment in a discriminatory manner?

19     A    Yes, it was -- Ms. -- what's her name?

20 Ms. Kimberly [sic], she got -- when she came there, she

21 lied.

22     Q    Well, Wackenhut challenged your filing for

23 unemployment benefits; correct?

24     A    That's correct.

25     Q    And there was an actual in-person hearing