# EXHIBIT B
# PART IV

Jones v. Wackenhut &#38;#8230; Google Inc.          Doc. 76 Att. 6

Dockets.Justia.com

1    conducted?

2        A    That's correct.

3        Q    And that was conducted at the Georgia

4    Department of Labor?

5        A    Yes.

6        Q    And you were denied unemployment benefits;

7    correct?

8        A    Yes.  I was going to go ahead and -- Georgia --

9    like most of its courts, Georgia labor board and

10   everything else under the Georgia government, it's not

11   what you know, it's who you know.

12       Q    Okay.  So you were denied unemployment

13   benefits?

14       A    Right.  Wackenhut --

15       Q    And that's all I had in terms of my question

16   there.  Thank you.

17            And have you now told me about each instance

18   which you claim constitutes discrimination by Wackenhut?

19       A    Uh-huh.  Yes.

20       Q    Can you identify any other Wackenhut guards who

21   Mr. Penifold or another Google manager accused of

22   sleeping on the job?

23       A    No.

24       Q    And after your Google assignment ended, you

25   were -- you went on assignment at GE; correct?

1    A    Right.

2    Q    Okay.  And that -- that GE assignment began on

3  July 25th, does that sound right?

4    A    It could have been.

5    Q    Okay.  Let's stop.  We'll pick back up with the

6  GE assignment when we come back.  If we could maybe just

7  take a lunch now.  Is that okay?

8       (Lunch recess from 1:10 p.m. through 1:46 p.m.)

9  BY MR. FERGUSON:

10    Q    Mr. Jones, we're back on the record.  And we

11  were -- before we took our lunch break, we were talking

12  about your Google assignment, and I want to discuss some

13  of your -- or your other assignment after Google,

14  but just a few follow-up questions about the Google

15  assignment.

16       I believe you testified that it was -- was J.E.

17  Penifold who decided to end your Google assignment;

18  right?

19    A    That's right.

20    Q    And is it safe to say you don't know whether

21  anyone from the Wackenhut corporate office was involved

22  in that decision?

23    A    Corporate office, no.  But I believe that

24  Ms. Jennifer Turner had -- had her hand into it.

25    Q    Okay.  And I know you testified that you think

1    Ms. Turner was involved, but you don't have any

2    knowledge of anybody from the corporate office being

3    involved; right?

4        A    Well, they -- they were sitting on their hands

5    and just allowed her to do whatever she wanted to do,

6    and so in that way they were involved in it by letting

7    her do whatever she wanted to do.

8        Q    But in terms of making the decision, you don't

9    have any knowledge of anybody from the Wackenhut

10   corporate office being involved in that decision-making

11   process; right?

12       A    No.

13   (Defendant's Exhibits Nos. 17 through 19 were marked.)

14   BY MR. FERGUSON:

15       Q    Mr. Jones, I've handed you three exhibits

16   there.  Here's the third one (indicating).  If you could

17   look at the first two, those are Exhibits 17 and 18

18   right there (indicating).  And have you seen these

19   documents before?

20       A    Not that I can remember.

21       Q    After your Google assignment ended, Wackenhut

22   offered you guarding assignments at -- or do you recall

23   Wackenhut offering you guarding assignments at Yamaha

24   and Quaker Oats?

25       A    They could have.

1      Q    So they could have, but as you sit here, you

2    don't recall whether they did or did not?

3      A    No.  They usually give you two or three stalls

4    to go to.  But if I -- what I'm looking at here, 8.50 --

5    8.50 and one here at $9, so I can understand what I did.

6      Q    Okay.  So you -- you're looking at -- you're

7    looking at Exhibit 19 there, which references a pay rate

8    of $9 an hour at GE, and Exhibit 17 references a pay

9    rate of rate 8.50 an hour at Quaker Oats, and 18

10   references a pay rate of 8.50 an hour at Yamaha; is that

11   correct?

12     A    That's correct.

13     Q    Okay.  And you did not accept the Quaker Oats

14   assignment; is that right?

15     A    I believe I would take the one with the higher

16   pay.

17     Q    Okay.  So you -- you never -- you did not

18   accept Wackenhut's offer to work at Quaker Oats; right?

19     A    If they gave -- I don't even recall them even

20   telling me.  But I would say no.

21     Q    Okay.

22     A    Not if they're paying 8.50.

23     Q    And same with Yamaha, you never worked on an

24   assignment at Yamaha; right?

25     A    No.

1    Q    Turning to Exhibit 19, does this accurately

2    reflect that a GE guarding assignment was offered to

3    you?

4    A    I worked at GE.

5    Q    So you worked on an assignment -- a guarding

6    assignment for Wackenhut at GE?

7    A    Right.  I think so.  I think it was GE.  Fulton

8    Industrial?  Yeah, I think so.

9    Q    And this shows that -- well, is that your

10   signature appearing on Exhibit 19?

11   A    Yes.

12   Q    Do you recall meeting with Carlos Garcia on

13   July 25th to discuss that GE assignment?

14   A    Yes.

15   Q    And there's a box there where it has a check

16   mark or an X on yes, so does that mean that you accepted

17   the GE assignment?

18   A    Yes.

19   Q    And so Carlos Garcia was the person who made

20   that GE offer to you; right?

21   A    Right.

22   Q    And what was Carlos's title again, job title?

23   A    I think he was a -- the area manager.

24   Q    For Wackenhut?

25   A    Right.

1     Q    What was his area?

2     A    I don't know offhand.

3     Q    But it was -- it included Atlanta; right?

4     A    Right.

5     Q    When did your GE assignment begin?

6     A    Oh, I couldn't tell you when it began.  It must

7 have began on the next day.

8     Q    And what date would that be?

9     A    The 26th.

10    Q    July 26th of 2006?

11    A    That's correct.

12    Q    When you say "the next day," you mean --

13 Exhibit -- Exhibit 19 shows that the offer of the GE

14 assignment was made to you on 7/25 of 2006.  And you

15 think you --

16    A    They sent me there the next day, yeah.

17    Q    You started there the next day?

18    A    Uh-huh.

19    Q    Okay.  And that GE assignment was in Atlanta?

20    A    Yes.

21    Q    Who was your supervisor there?

22    A    I don't know his -- offhand.  I know they

23 was -- they had switched supervisors at -- at that

24 location.

25    Q    But you don't recall the name of your

1    supervisor?

2        A    No.   The one -- whoever was there when I got

3    there, he was removed within about a few days and a new

4    guy came in.

5        Q    How many hours per week was your assignment

6    there?

7        A    40.

8        Q    And was that the same number of hours that your

9    Google assignment was for?

10       A    Yeah, 40, and then overtime if you -- if it was

11   available.

12       Q    Well, what was your rate of pay at GE, if you

13   remember?

14       A    It says $9 here.

15       Q    Is that right?

16       A    It should be.

17       Q    What was your rate of pay at Google?

18       A    Ten.

19       Q    Which days per week were you working at GE?

20       A    This here says Wednesday, Thursday, Friday,

21   Saturday, Sunday.

22       Q    Does that sound accurate to you?

23       A    Yes.

24       Q    What shift was that on?

25       A    That's 2200, so that's --

1      Q    Ten o'clock p.m.?

2      A    Yeah, that's ten o'clock to 6:00 in the

3  morning.

4      Q    So ten o'clock p.m. to 6:00 in the morning?

5      A    Uh-huh.

6      Q    Similar graveyard shift --

7      A    Right.

8      Q    -- to what you -- a similar shift to what you

9  had at Google?

10     A    Uh-huh.

11      (Defendant's Exhibit No. 20 was marked.)

12  BY MR. FERGUSON:

13     Q    Mr. Jones, I've handed you Exhibit 20.  Have

14  you seen this document before?

15     A    Yes.

16     Q    Is that your signature on the bottom of

17  Exhibit 20?

18     A    Yes.

19     Q    And this is a resignation letter that you

20  submitted to Wackenhut?

21     A    It's more of a -- well, the subject is

22  resignation, but as I said, I was forced off the

23  position.

24      According to the EEOC, when you file charges,

25  it takes two weeks for -- for it to come because it has

1   to go through they legal department. I knew once they

2   would have got that second charge and they was going to

3   fire me. That's why -- I didn't take a vacation, so I

4   took one week off unpaid leave and -- and submitted my

5   resignation with one week's notice on one week paid --

6   unpaid leave.

7         Therefore, I would have to get -- I knew I have

8   to get a position within that week because I wasn't

9   going to go back there. Because if I did, they was

10   going to fire me.

11     Q    So you resigned from the GE assignment; right?

12     A    Correct.

13     Q    And the GE assignment, that was the last

14   Wackenhut assignment that you had?

15     A    Yes.

16     Q    And you were talking about some -- the legal

17   department taking up to two weeks to process. What --

18   are you talking about the EEOC --

19     A    That's correct.

20     Q    -- legal department?

21     A    Uh-huh.

22     Q    And you mentioned that someone from the EEOC

23   told you that you were going to be fired; is that right?

24     A    Well, it was just a loose conversation because

25   of they actions. So when I went down there and filed

1    the charges for the three days' suspension and for the

2    P.C. Penniman [sic] action, I knew that I had two weeks

3    to leave.

4         So my thing was to take off this paid --

5    this -- take that -- take those two weeks off and then

6    find another position.  Because if I was still at

7    Googles, I would have -- I'd still be at Wackenhut.

8         Q    But no one from Wackenhut ever told you that

9    you were going to be fired?

10        A    Yes.  As I said in the unemployment dispute

11   that, to me, this paper here, employee recommends [sic],

12   is -- it's very clear.

13        Q    And let the record reflect that Mr. Jones is

14   referring to Exhibit -- let me grab what I think it is,

15   and we can look at that.

16        A    I think it's the same one that she had there.

17        Q    My guess is it's No. 11.  Is that the one

18   you're talking about (indicating)?

19        A    Oh, okay.

20        Q    Now, you said -- Mr. Jones, correct me if I'm

21   wrong, but you said there is a document, one of the

22   exhibits that we looked at today, which says that you

23   were going to be fired?

24        A    Final warning, that's correct.

25        Q    And is that -- that's Exhibit 11; is that

1 correct?

2   A Yes.

3   Q Where on Exhibit 11 does it state that you will

4 be fired if you file another EEOC charge?

5   A It doesn't say exactly that I will be fired if

6 I filed another EEOC charge.  It says final warning,

7 meaning that if I was going to go ahead and file another

8 charge they was going to fire me.  They charges doesn't

9 state that.  It's there that I was not -- I was still

10 disputing the charges of leaving me from Google.

11   Q So that was your suspicion that if you filed

12 another charge you were going to get fired; right?

13   A Yes.

14   Q And but no one -- no one ever -- no Wackenhut

15 employee ever came to you and met with you and said,

16 Mr. Jones, if you file another EEOC charge, we're going

17 to -- we're going to get rid of you; correct?

18   A I think that they body language when I was up

19 in the office made it perfectly clear that they was

20 going to take actions if they was going to get --

21   Q But that's not my question.  My question was:

22 No Wackenhut employee ever verbally told you, Mr. Jones,

23 if you file another charge, you're going to be

24 terminated?

25   A Oh, of course they're not going to tell you

1    that.

2        Q    Yeah.  And at the time you resigned, do you

3    know whether Wackenhut had even received your latest

4    EEOC charge?

5        A    No, they didn't.  They didn't receive it.  Of

6    course not.

7        Q    So they hadn't received it yet when you --

8        A    Right.  Because as I said, it takes two weeks.

9        Q    And what do you mean it takes -- two weeks from

10    after you file it for the EEOC to mail it out?

11        A.    Yeah.  It usually takes two weeks, ten days.

12        Q    Okay.  So within that two weeks, is it your

13    understanding that the -- it takes the EEOC two weeks to

14    process --

15        A    Process.

16        Q    -- and mail it out?

17        A    Right.

18        Q    Mail it out to Wackenhut?

19        A    That's correct.

20        Q    So you're not sure when Wackenhut received that

21    last charge of discrimination -- I'm sorry -- the last

22    charge that you filed with the EEOC; correct?

23        A    Yeah, it was within ten days to two weeks after

24    I filed it, they received it.

25        Q    And you're not sure who from Wackenhut received

1    that charge; right?

2        A    Yes.  It usually goes to -- oh, yes, it goes

3    to -- what's his name?  Let me get his name.  I had his

4    name here.

5        Q    Well, we can come back to that.

6        A    Yeah.  It was on that page where it was

7    Gonzalez's name and another person's name, I think, you

8    had there.  Well, it goes to him since he's the head of

9    that -- head of the Atlanta branch.

10       Q    Well, let's get into that.  Let's get into the

11   charges of discrimination that you filed.  We can

12   introduce those as exhibits.  How about that?

13       A    Uh-huh.

14            (Defendant's Exhibit No. 21 was marked.)

15   BY MR. FERGUSON:

16       Q    Okay.  Mr. Jones, I hand you Exhibit 21.  Do

17   you have Exhibit 21 in front of you?

18       A    Yes.

19       Q    And this is a copy of your first EEOC charge

20   against Wackenhut; right?

21       A    That's correct.

22       Q    And is that your signature appearing on page 2

23   of this charge?

24       A    That's correct.

25       Q    And so you submitted this charge to the EEOC on

1  May 16th, 2006; right?

2      A    That's correct.

3      Q    The first page of this exhibit is dated

4  May 25th in the lower left-hand corner, would you agree?

5      A    May 25th, yes.

6      Q    And so that's the date that the EEOC mailed the

7  charge to Wackenhut, right, which would fit within your

8  period --

9      A    Yeah.

10     Q    -- that it takes ten days, two weeks to get out

11  the door?

12     A    Right.

13     Q    So is that a yes?

14     A    Yes.

15     Q    And you don't know exactly what day Wackenhut

16  received this first charge; correct?

17     A    No.

18     Q    And I want to look on page 2 of the charge, you

19  checked the boxes for retaliation and age

20  discrimination; right?

21     A    That's right, uh-huh.

22     Q    And you did not check the disability

23  discrimination box; correct?

24     A    Disability?

25     Q    Yeah, just to the right --

1    A    No.

2    Q    -- of the word "age," you didn't check that

3    box?

4    A    No.

5         And they made a mistake on here, too.  This

6    wasn't -- we looked at it before when I filed the other

7    charges.  They put the retaliation.  That box shouldn't

8    have been retaliation because this was the first charge.

9    Q    Okay.  So -- so the box retaliation should not

10   have been checked?

11   A    Should -- right.

12   Q    And you did not check the sex discrimination

13   box, right, or the religion discrimination box?

14   A    No.

15   Q    And you didn't check the race discrimination

16   box on this charge; right?

17   A    No.

18   Q    And in the body of the charge, you state that

19   on May 14th, 2006, Ms. Turner threatened you with

20   discharge.

21   A    She -- right.  She said she was going to fire

22   everybody.

23   Q    Is that Jennifer Turner?

24   A    Yes.

25   Q    Then in paragraph 3 of that, you state that you

1   believe you will be discriminated against due to your

2   age and retaliated against; is that -- is that accurate?

3        A    Or it should have -- it should have said that I

4   was being discriminated against because of age.  I see

5   how the way they wrote that up.

6        Q    So when you filed this charge, in your opinion,

7   had you already been discriminated against?

8        A    She was getting rid of old -- oh, yes.  That --

9   that's -- that have to do with sleeping on the job

10  thing.

11       Q    Well, that was a -- the sleeping on the job

12  incident happened on July 21st, 2006?

13       A    Yeah, it happened here, too.

14       Q    Well, this is dated May 16th, 2006.

15       A    Yeah, they accused me of it twice.

16       Q    Okay.  And at the time you filed this charge,

17  you had not been retaliated against; right?

18       A    Retaliated against for this -- for this charge

19  here, yeah.  No.

20       Q    Well, just in general, you told me that they

21  should not have checked the box retaliation?

22       A    No, that wasn't retaliation.  It should have

23  been just the charge.

24       Q    Okay.  Just discrimination.

25            And Jennifer Turner didn't actually discharge

1    you on May 14th, 2006, did she?

2        A    Well, one of her supervisors, I believe --

3        Q    And my question is a pretty simple question.

4    She didn't actually discharge you on May 14th, did she?

5        A    No.  I don't think they would do so, not while

6    they -- not while the EEOC is investigating a charge

7    there.

8        Q    Okay.  So it's your belief that discrimination

9    had already occurred or you had already been

10   discriminated against as of May 16th when you filed this

11   charge?

12       A    That's right.

13       Q    What actions -- or what had Wackenhut done --

14   what had they already done that was discriminatory?

15       A    What they was doing, they was letting people go

16   who -- based on they age, and they was just making up a

17   hostile environment by stating that I was sleeping on

18   the job.  They took pictures of me sleeping on the job.

19   They had me on the camera.  They -- I think they

20   e-mailed it up to the main office, and after observing

21   the film, they say, no, that man isn't sleeping on the

22   job.

23       Q    So it was two things.  It was they were letting

24   people go based on age?

25       A    Yes.

1    Q    And as we sit here, can you name for me any

2 employees above the age of 40 who Wackenhut let go from

3 the Google assignment?

4    A    Well, it's in the discovery.

5    Q    But as we sit here today --

6    A    No.

7    Q    Okay.  And you said that they were making up

8 complaints about sleeping on the job.  Who is they?  Is

9 that Ms. Turner?

10    A    No, Ms. Turner didn't start that.  It was -- I

11 think we had -- we had a bogus -- I think here -- it was

12 done by -- recommended -- oh, here it is.  Kelly [sic],

13 right here (indicating).  That has something to do with

14 that first charge because it had to do with the -- he

15 was the one that accused me of sleeping on the job.  He

16 said he saw me on the camera.

17    Q    All right.  You've handed me -- let me see

18 which exhibit number this is -- Exhibit 15.

19    A    Right.  That was one of her supervisors.  What

20 he -- how it was started, that he would pull me off

21 my --

22    Q    And he -- and I'm sorry to interrupt you.

23 That's Timothy Kenny?

24    A    Right.

25    Q    Because that's -- Exhibit 15 references a

1   Timmy -- Timothy Kenny; correct?

2       A   Correct.

3       Q   Okay.

4       A   And he would pull workers off they post and put

5   them on reboot.  Rebooting means that you rebooting the

6   computers.  So when I saw Ms. Turner come over, I asked,

7   you know, can he do that.  And she says, no, he can't do

8   that.  So she recommended [sic] him, told him, look, you

9   can't do that.  Then that's what -- that's what created

10  these charges.  Because after he complained to her

11  personally -- because that was her pet -- that's when

12  she just went off and said that she was going to get rid

13  of everybody because other people was complaining about

14  him.

15      Q   Right.  So have you told me -- so do you

16  believe Timothy Kenny discriminated against you based on

17  your age?

18      A   No, what Timothy Kenny was going to do, he was

19  just -- he was just a ignorant individual person.

20  That's all.  He wanted to get even, you know, retaliated

21  against me for telling Ms. Turner that he was pulling

22  people off the job.

23      Q   So that was just a dispute between you and

24  Timothy Kenny?

25      A   Yes, it was a dispute with him.  Yeah.

1    Q    Right.  And when did -- and that dispute

2    occurred prior to the filing of your first charge?

3    A    Yeah, because that's what those first charges

4    is all about.

5    Q    I thought you testified that you don't -- that

6    you never got Exhibit 15?

7    A    What, this here (indicating)?

8    Q    Yes.

9    A    No.  I'm talking about those charges

10   there (indicating).  That's what it is.  This here, I

11   don't remember this (indicating).

12   Q    Okay.  So tell me again the -- you said when

13   you filed this charge, the first charge on May 16th,

14   that some discrimination had already occurred against

15   you.  And the two incidents you gave me were that

16   Wackenhut were letting people go based on age and they

17   were making up complaints about you sleeping on the job?

18   A    That's correct.

19   Q    Anything else that had happened prior to your

20   filing of this charge?

21   A    The first charges, no.

22        (Defendant's Exhibit No. 22 was marked.)

23   BY MR. FERGUSON:

24   Q    Now, I've handed you what we've marked as

25   Exhibit 22.  Do you have that in front of you?

1    A    Yes.

2    Q    What is this exhibit?

3    A    This is the closing of these files.

4    Q    This is the right to sue notice that the EEOC

5  issued to you after you filed your first EEOC charge?

6    A    Right.

7    Q    Okay.  And if you look at -- on Exhibit 21, the

8  charge number on Exhibit 21 matches the charge number

9  listed on Exhibit 22.  Would you agree with that?

10    A    Charge No. 21?

11    Q    Yes, sir.  The charge number on Exhibit 21

12  matches the charge number on Exhibit 22?

13    A    Oh, yes, it's the same charge.

14    Q    Yeah.  And you recall receiving this right to

15  sue notice from the EEOC?

16    A    That's correct.

17         The EEOC doesn't -- what the charges was, that

18  all the people at Googles was -- was minorities.  They

19  were black except one.  What they would -- the charge

20  that they could come up with was black on black racism

21  because Ms. Turner was black, and that doesn't come

22  under -- and therefore, it didn't come underneath they

23  guidelines.

24    Q    And the -- this EEOC right to sue notice,

25  Exhibit 22, that's dated June 9th, 2006?

1     A    Right.

2     Q    So do you recall receiving this in June of

3   2006?

4     A    Yes, I received it.

5     Q    I now want to look at your second EEOC charge.

6             MR. FERGUSON:  We can mark that as 23.

7        (Defendant's Exhibit No. 23 was marked.)

8  BY MR. FERGUSON:

9     Q    I've handed you what's been marked as

10  Exhibit 23.  Is this a copy of your -- of the second

11  EEOC charge that you filed against Wackenhut?

12     A    That's correct.

13     Q    And is that your signature appearing on page 2?

14     A    Yes.

15     Q    So you submitted this charge to the EEOC on

16  June 14th, 2006?

17     A    That's correct.

18     Q    And in this charge you checked the box claiming

19  retaliation; right?

20     A    Right.

21     Q    And you did not check the disability

22  discrimination box?

23     A    No.

24     Q    And similarly, you did not check the sex

25  discrimination or the religion discrimination, age

1    discrimination or race discrimination boxes; right?

2       A    Right.

3       Q    And in the charge you state that you have been

4    retaliated against and that wages were deducted from

5    your paycheck?

6       A    That's correct.  Ms. Jennifer Turner did it and

7    the payroll manager.

8            (Defendant's Exhibit No. 24 was marked.)

9    BY MR. FERGUSON:

10      Q    And I've handed you what we've marked as

11   Exhibit 24, and I'll represent to you that these were

12   four pay stubs that you produced to me during the

13   discovery process?

14      A    Right.

15      Q    And would you -- do you recall producing those

16   to us?

17      A    Oh, sure.  Uh-huh.

18      Q    And these are copies of pay stubs issued to

19   you; is that right?

20      A    That's correct.

21      Q    Now, I want to -- on these pages, I want to

22   look at this -- the column here that says prior

23   overpayment adjustments.

24      A    Right, I see.

25      Q    Yes, sir.

1      A     That's why I sent them to you.

2      Q     On page 1 of Exhibit 24, I see a prior

3  overpayment adjustment of 91.65.  Do you see that?

4      A     Yes.

5      Q     And that was a deduction made from your

6  June 9th, 2006, paycheck --

7      A     Yes.

8      Q     -- is that correct?

9      A     Yes.

10     Q     Okay.  Because I see -- on the first page of

11 this exhibit, I see towards the bottom a date of

12 June 9th, 2006.  So was that the date that the check was

13 issued to you?

14     A     That's correct.

15     Q     And similarly, on the next three pages, one is

16 dated 7/21/06.  So 7/21/06 is the date that the pay stub

17 on page 2 was issued to you; right?

18     A     That's correct.

19     Q     And then on page 3 that's a pay stub from

20 August 4th, 2006; is that right?

21     A     That's correct.

22     Q     And then the last page is a pay stub from

23 August 18th, 2006?

24     A     That's correct.

25     Q     And looking back at Exhibit 23, which is the

1    charge of -- your second EEOC charge.

2         A    Uh-huh.  Yes.

3         Q    On the bottom of page 2, that's dated

4    June 14th, 2006; right?

5         A    Right.  That's correct.

6         Q    So on your second EEOC charge, the only

7    deduction that you're complaining about is the

8    June 9th, 2000 -- or the deduction made from your

9    June 9th, 2006, paycheck; is that right?

10        A    June 9th?

11        Q    Yes, sir.

12        A    No.

13        Q    Okay.  What -- in the June 14th charge that you

14   filed, what other deductions were you complaining about?

15        A    It was the deduction of a hundred and -- I

16   think it was 139 some odd dollars.

17        Q    And I'll show you what -- I think that was a --

18   something that you were referencing in your third EEOC

19   charge.

20        A    This is the second one?

21        Q    Yes, sir.  And I'm happy to hand you your

22   third.  Why don't we go ahead and have that marked.

23        A    Oh, there was two overpayments that they took

24   out of my salary.

25        Q    That's right.

1    A    They did it twice.

2    Q    And if you'll bear with me, the first one was

3  for 91.65 in your June 9th, 2006, paycheck; right?

4    A    Right.

5    Q    And the second one is for --

6    A    45.

7    Q    -- 45.97 from your July 21st, 2006, paycheck;

8  is that right?

9    A    That's correct.

10   Q    Okay.  So when you filed your second EEOC

11  charge on June 14th, the only deduction that you were

12  complaining about was from your June 9th, 2006, paycheck

13  because you hadn't been --

14   A    The other one wasn't deducted -- deducted yet,

15  right.

16   Q    Okay.  That's what I thought.  So in your

17  second EEOC charge, you allege that there was a

18  retaliatory deduction of 91.65?

19   A    That's correct.

20   Q    Here's your third EEOC charge.

21        (Defendant's Exhibit No. 25 was marked.)

22  BY MR. FERGUSON:

23   Q    Mr. Jones, I've handed you Exhibit 25.  Is this

24  a true and accurate copy of the third EEOC charge that

25  you filed against Wackenhut?

1     A   I believe it is.

2     Q   And is that your signature appearing at the

3  bottom of page 2 of Exhibit 25?

4     A   That's correct.

5     Q   And when did you submit Exhibit 25 to the EEOC?

6     A   July 24th.  That's what's on here.

7     Q   Of 2006?

8     A   Right.

9     Q   And had you already started your assignment at

10  GE when you filed this charge?

11     A   I could have been.

12     Q   But your third charge, it doesn't concern

13  anything that happened at GE?

14     A   No, nothing happened at GE.

15     Q   It was -- your second and third charges

16  concerned --

17     A   Googles.

18     Q   -- concerned retaliation by Google; right?  Or

19  I'm sorry.  Retaliation that occurred during your Google

20  assignment?

21     A   That's correct.

22     Q   And when you said nothing happened at GE, you

23  mean no discrimination or retaliation happened at GE;

24  right?

25     A   I wasn't there that long.

1      Q    Right.  And so the answer to that is no?

2      A    No.

3      Q    And on this third charge, you checked the box

4 for retaliation; is that accurate?

5      A    Right, that is retaliation for the first

6 charge.

7      Q    And you also checked the age discrimination

8 box; right?

9      A    That's correct.

10     Q    And you did not check the disability

11 discrimination box or the sex discrimination or the race

12 discrimination or the color discrimination or the

13 national origin discrimination boxes; right?

14     A    That's correct.

15     Q    And in this charge, similar to your second

16 charge, you state that you were retaliated against and

17 that wages were deducted from your paycheck; right?

18     A    That was the wages from the paycheck, uh-huh.

19     Q    And if you could turn back to Exhibit 24,

20 please.  On page 2 I see a -- an overpayment adjustment

21 of 45.97 from your July 21st paycheck.  Do you see that?

22     A    Yes, I do.

23     Q    So is that what you were complaining about in

24 your second -- I'm sorry -- in your third and final EEOC

25 charge?

1     A     Yes, have to be.

2     Q     And if you add the 91 -- $91.65 deduction on

3  page 1 with the $45.97 deduction on page 2, you get a

4  grand total of $137.62; is that right?

5     A     That's correct.

6     Q     Okay.  And sticking with these pay stubs,

7  Exhibit 24, pages 3 and 4, those don't reflect any

8  additional overpayment adjustments; they just show a

9  year-to-date deduction amount of 137.62; is that right?

10    A     That's correct.

11    Q     And you resigned on August 2nd, 2006, which was

12 the date of that letter?

13    A     Okay.  If the letter states that, yeah.

14    Q     And the last page of Exhibit 24, the pay stub

15 exhibit, is a pay stub dated August 18th, 2006.  Do you

16 agree with that?

17    A     That's correct.

18    Q     And was that the last paycheck that Wackenhut

19 issued to you?

20    A     I can't say.  I don't know for sure.

21    Q     But if you resigned -- to me it makes sense,

22 because if you resigned on August 2nd and then your

23 final paycheck would be shortly thereafter, August 18th?

24    A     Right.

25    Q     Does that sound right to you?

1     A     It sounds right.

2     Q     So all in all, you claim that there were two

3  retaliatory deductions made by Wackenhut?

4     A     That's correct.  Plus the three-day suspension.

5     Q     Right.  And we've already talked about that?

6     A     Right.

7     Q     And the total for those two deductions was

8  $137.62?

9     A     That's correct.

10     Q     And did Wackenhut tell you that it was making

11  those deductions because it discovered you had been

12  overpaid for work from February of 2006?

13     A     When I inquired about it, I -- they said

14  something of the sort, but I knew it was retaliation.

15  When I got a copy of the papers from the EEOC of the

16  payrolls, you can see where they scribbled all over the

17  pages, making it impossible, you know, to detect what

18  they did.

19     Q     And you don't know -- so you dispute that you

20  were overpaid in February 2006?

21     A     Yes.

22     Q     And you don't know who from Wackenhut

23  determined that you had been overpaid; right?

24     A     I spoke to Ms. Turner.  Ms. Turner said the

25  payroll manager did it, and the payroll manager said

1    that Ms. Turner did it.

2         Q    What was the name of the payroll manager?

3         A    Downing [sic], I believe.  Let me get her right

4    exact name here.  Linda Downing [sic], D-E-M-I-N-G.

5    Wait a minute.  Is that how you spell her last name?

6    Yeah, that is.  D-E -- D-E-M-I-N-G.

7         Q    And have you ever met Ms. Deming?

8         A    Yes.

9         Q    What -- where does she work?

10        A    She worked in the -- she worked as a payroll

11   manager in the main office.

12        Q    Was that the Marietta corporate office?

13        A    Yes.

14        Q    What is her race?

15        A    Oh, she's white.

16        Q    And what is her age?

17        A    She -- oh, she could be maybe about 55.

18        Q    So she handles payroll duties?

19        A    Well, she resigned.  I think she resigned

20   over -- over this incident right here.  She resigned

21   from payroll.

22        Q    But you have no -- that's you just speculating

23   that she resigned because of your lawsuit; correct?

24        A    Right.  She never said it directly.

25        Q    And no one ever told you that she resigned

1  because of your lawsuit; right?

2      A    No.

3      Q    And what was Ms. Deming's job title?

4      A    She was the payroll manager.

5      Q    That was her title.  Okay.  So you don't know

6  whether it was Ms. Deming or Ms. Turner who actually

7  decided to make those deductions from your check?

8      A    I believe it was Ms. Turner.  I believe

9  Ms. Demings [sic] just got caught up in, you know, the

10 water fountain stuff in the office, because she didn't

11 know who I was, but I knew who she was when I went to

12 turn in my uniform.

13     Q    But you don't know -- you never -- no one ever

14 told you that it was Ms. Turner who made that decision;

15 right?

16     A    Yes, she did.

17     Q    Ms. Turner told you that --

18     A    No, Ms. Demings told me.

19     Q    Ms. Deming told you that Ms. Turner decided to

20 make the --

21     A    Yes.

22     Q    -- deductions?

23     A    They was -- they were pinning it on each other.

24     Q    And you don't know if somebody directed

25 Ms. Turner to make those deductions from your paycheck;

1  right?

2     A    I only know what Ms. Deming told me. She said

3  that your supervisor was the one that did it.

4     Q    So it's possible that somebody instructed

5  Ms. Turner to make that deduction; right?

6     A    Well, she doesn't make the deduction. What she

7  does is she tells the payroll manager that this man had

8  a overpayment, and then the payroll manager does it.

9     Q    Okay. So it's possible that someone told

10  Ms. Turner to tell the payroll manager to make that

11  deduction; correct?

12     A    I don't believe so.

13     Q    Why do you say that?

14     A    Because the actions that was being taken was

15  retaliation for the -- for the first charges that I

16  made. Ms. Turner was creating those -- those -- those

17  deductions.

18     Q    I realize that's what you believe. But it's

19  still possible that someone told Ms. Turner --

20  instructed Ms. Turner to tell payroll to make those

21  deductions; right?

22     A    I can't see that. That's a ghost story.

23     Q    But that's possible, though?

24     A    Anything's possible.

25     Q    And so you're not sure whether the person who

1   made the decision to enact the deductions had knowledge

2   of your EEOC charges; correct?

3      A   Yes.  Everybody in the office knew it.

4      Q   And, now, when you say "everybody in the

5   office," what office are you talking about?

6      A   The main office.

7      Q   The corporate office?

8      A   Right, because I'm sure they discussed it.

9      Q   Where is Wackenhut's North American

10  headquarters?  Is that in Florida?

11     A   I believe so, yes.

12     Q   So if somebody in Florida corporate

13  headquarters made the decision to make these deductions

14  from your paychecks, you would have no knowledge of

15  that; correct?

16     A   No.  I only got the knowledge of what

17  Ms. Turner said.  Ms. Turner said Ms. Demings did it.

18  When I called her up, she says Ms. Turner did it.

19     Q   And do you know when Wackenhut decided to make

20  these deductions from your paycheck?

21     A   No.  They just -- I just saw it on there.  I

22  saw the money removed from my salary, and that's when I

23  first found out about it.

24     Q   And you started with Wackenhut in February

25  2003; right?

1    A    Right.

2    Q    And you filed your first EEOC charge in May

3    2006, I believe; correct?

4    A    Correct.

5    Q    Between February 2003 and May 2006, did you

6    ever receive a paycheck from Wackenhut and think that a

7    deduction had been improperly made?

8    A    In Wackenhut?

9    Q    Yes.

10    A    It was -- oh.  Well, they got -- they got rid

11    of they -- they main office.  They fired them.

12          Because when I was working at the government

13    stall, we was working 12 hours, but we was told to be to

14    work at 5:30.  You know, we was working from 6:00 to

15    6:00, but come in 5:30 for briefing.  We was supposed to

16    get paid for that, but we wasn't paid for it.  Then all

17    of a sudden, they found something going wrong with the

18    books, and everyone at that stall got back pay.  I think

19    I got about $1800.

20    Q    Well, my question is a little bit different,

21    though.  It's between February 2003 and May 2006 when

22    you filed your first charge, did you ever receive a

23    paycheck and think that a deduction had been improperly

24    made from the paycheck?

25    A    No, that was the only one.

1    Q    Okay.  Do you know any other Wackenhut guards

2  who've had a dispute with Wackenhut about their

3  paychecks?

4    A    I don't get involved in other people's

5  business.

6    Q    So that's a no?

7    A    No.

8    Q    And do guards record their hours on time

9  sheets, Wackenhut guards?

10   A    I think we wrote it in.

11   Q    So handwriting it in on a time sheet?

12   A    I think so.

13   Q    And does Wackenhut then take those time sheets

14  to determine the number of hours that each guard worked?

15   A    That's correct.

16   Q    Is it common -- because all that's handwritten,

17  is it common for a guard to be accidentally overpaid or

18  underpaid based --

19   A    No.

20   Q    -- on a miscalculation?

21   A    Well, Ms. Turner, she keeps a record of all

22  that.  And before the payroll goes in, she knows who

23  worked when and who didn't work because she's got her

24  supervisors there to say.  If somebody came in late,

25  etcetera, you know, you got your little informants that

1    say who came in late and who left early, etcetera.

2         Q    So it does sound like from time to time there

3    was situations where someone was overpaid or underpaid

4    for working?

5         A    Not that I know.

6         Q    Who do you contend retaliated against you?

7         A    Ms. Turner.

8         Q    Anybody else?

9         A    Do you mean to aid -- in helping Ms. Turner?

10   It was Ms. Kimberly [sic] and Mr. J.C. Pittman [sic],

11   whatever his name is, Pittman [sic].

12        Q    Penifold?

13        A    Penifold.

14        Q    Turner and Penifold, and you mentioned somebody

15   else?

16        A    Yes, Teresa Kirby.

17        Q    Anybody else that you believe retaliated

18   against you?

19        A    Oh, that helped in the retaliation?  Yes,

20   Mr. Godfrey and, of course, Ms. Denton [sic].

21        Q    Deming, Ms. --

22        A    Yes.

23        Q    The payroll manager?

24        A    Yes.

25        Q    Okay.  Anybody else that you believe retaliated

1  against you?

2      A    No, that's it.

3      Q    So that's Ms. Turner; Mr. Penifold; Teresa

4  Kirby; Burkeley Godfrey; and Ms. Deming, the payroll

5  manager?

6      A    That's correct.

7      Q    And I want to spend some time discussing each

8  of -- each of those five.

9           What did Ms. Turner do that was retaliatory?

10      A    Oh, the payroll, the suspension, and the lies

11  and the hostile environment.

12      Q    And when you say "the payroll," you're talking

13  about the two deductions on Exhibit 24?

14      A    That's correct.

15      Q    And the suspension, are you talking about the

16  suspension from the Google assignment?

17      A    That's correct.

18      Q    The lies, are you talking about what you

19  believe is her lying about you sleeping on the job?

20      A    That and about the 18 hours.

21      Q    The -- what do you mean by that?

22      A    Well, I was supposed to be relieved.  I mean, I

23  couldn't call somebody to tell them to relieve me.  That

24  has to come from a manager's standpoint.

25      Q    So you're talking about the relief situation on

```
1   July 21st --

2       A    Yes.

3       Q    -- 2006?

4       A    That's correct, uh-huh.

5       Q    We kind of talked over each other there.

6   You're talking about the relief situation from

7   July 21st, 2006?

8       A    Right, when I worked 18 hours.

9       Q    So it's your belief that she didn't provide you

10  relief that day in retaliation for your earlier charges?

11      A    I believe so.  I believe she wanted me to just

12  leave the post open and walk out.

13      Q    And you say hostile -- that she subjected you

14  to a hostile environment, too?

15      A    That's part of the hostile environment right

16  there.

17      Q    Well, describe for me the hostile environment.

18  What --

19      A    Having me work there for the 18 hours.  And, of

20  course, all the other employees, they knew about it;

21  therefore, there was -- if I walk in a room, it got

22  silent.

23      Q    But she wasn't -- she wasn't sexually harassing

24  you, was she?

25      A    No, there was no sexual harassment.  No.
```

1    Q    And she wasn't racially harassing you?

2    A    I believe Ms. Turner was a racist.

3    Q    So do you believe that Ms. -- but you're not

4    alleging -- in none of your charges do you allege that

5    Ms. Turner subjected you to racial harassment; correct?

6    A    You mean name calling and etcetera?

7    Q    Well, just racial harassment.

8    A    Well, yes, I did, under the fact that she just

9    literally fired people outright without good reason.  As

10   I said, there -- as you gave me some papers, I think it

11   said 230 employees that worked at that stall in three

12   years.  Now, that's a -- that's a revolution [sic] door

13   right there.

14   Q    Weren't the majority of the guards on

15   assignment at Google African-American?

16   A    They -- they was different color.  But black,

17   yes.  They're Third World people, yes.  Some was

18   Hawaiian.  Some was West Indian.

19   Q    Would you say -- I think you testified earlier

20   that all but one of the guards --

21   A    That's correct.

22   Q    And let me finish, please, sir.  That all but

23   one of the guards on assignment at Google were

24   African-American?

25   A    That's -- no.  They was of black descent.

1   Afro-American meaning like myself be Afro-American.

2   You're not going to call her Hawaiian or Jamaican or an

3   Afro-American.

4       Q    So the majority of the guards at -- or on

5   assignment at Google were African-American?

6       A    Majority of them, yeah.

7       Q    And you're not alleging that -- well, are there

8   any other facts that support your belief that she

9   subjected you to a racial -- that she subjected you to

10  racial harassment?

11      A    Just that point there, that she -- as -- as a

12  black person, you're not going to try to put your own

13  people subject to any type of hard -- you know, a hard

14  situation.  And like I said, she fired people there,

15  like -- like she said, she fire everybody.  She didn't

16  care whether they can pay they bills, whether they can

17  find another job.  Her thing was she just fired people,

18  you know.

19      Q    And normally, once she fired somebody, she

20  would replace that person with another African-American;

21  right?  Because the vast majority --

22      A    Majority.

23      Q    -- were African-American?

24      A    That's correct.

25      Q    And in the EEOC charges that you filed, you

1  didn't allege racial harassment in the charges; right?

2      A     My first charges meant that she would fire

3  everybody, and saying everybody, everybody -- 99 percent

4  of everybody was black.

5      Q     That's not my question, though.  In the three

6  EEOC charges that you filed, you didn't allege racial

7  harassment in those charges?

8      A     No, I don't think I put down the racial

9  harassment.

10     Q     Did you have any meetings with Ms. Turner where

11 she said things -- she made comments to you that you

12 perceived as retaliatory, or was it just her actions

13 that spoke?

14     A     It's her actions spoke.

15     Q     So nothing that she said to you led you to

16 believe retaliation, it was her actions?

17     A     Outside that last -- that last day that I was

18 there when she told me to go up into the office.

19     Q     Are you talking about the day when she said

20 Mr. Penifold seen you sleeping --

21     A     That's correct.

22     Q     -- go to the office?

23     A     Uh-huh.

24     Q     That's right?

25     A     That's it.

1    Q    All right.  How about Mr. -- well, did

2  Ms. Turner retaliate against you in any other manners --

3  any other manner?

4    A    Outside the one we already discussed?

5    Q    What we discussed.

6    A    No.

7    Q    How about Mr. Penifold?

8    A    I never even known that man.  I seen him.  I

9  know what he looks like, but that's about it.

10    Q    So what did he do to you that you believe was

11  retaliatory?

12    A    He lied, and by -- well, they couldn't use the

13  camera anymore because they already tried to use that,

14  and charges was filed about using the camera.  So they

15  had to -- so they needed a eye witness.

16    Q    So when you say "he lied," you're talking about

17  the sleeping incident?

18    A    That's correct.

19    Q    And was that -- that's the only thing that he

20  did that you believe --

21    A    That's correct.

22    Q    -- was retaliatory?

23    A    Uh-huh.

24    Q    Okay.  Let me -- we're starting to talk over

25  each other a little bit.  So let me just -- the only

1  thing you believe that Mr. Penifold did that was

2  retaliation was lying about seeing you sleeping on the

3  job?

4      A    That's correct.

5      Q    How about you also testified that Teresa Kirby,

6  in your opinion, retaliated against you?

7      A    Throughout.

8      Q    What did Teresa Kirby do that was retaliatory?

9      A    Well, she was involved in that -- these charges

10 here, about the one that she gave me about the -- being

11 final warning.  She also made false charges when we went

12 to -- to the labor department.

13     Q    Okay.  So you believe that Teresa Kirby

14 retaliated against you by submitting --

15     A    False statements at the -- at the labor

16 department, false statements at the -- the day that I

17 got that last recommendation [sic] and --

18     Q    And what do you mean by that, the day you got

19 the last recommendation?

20     A    I mean, the last warning notice.

21     Q    July 21st?

22     A    Right.

23     Q    Okay.

24     A    And, of course, you know, she filed that phony

25 affidavit.  But that's after the fact.

1      Q    And you're talking about the affidavit --

2      A    That I served papers.

3      Q    -- about service of process?

4      A    Yes.  Uh-huh.

5      Q    The affidavit concerning service of process for

6   this lawsuit?

7      A    Right.

8      Q    Okay.  What false statements do you believe

9   that Ms. Kirby made?

10     A    At what point?

11     Q    Just what false statements do you believe she's

12  made in general?

13     A    Oh, okay.  The one at the labor department, she

14  testified that she did not receive the third charge,

15  which she did.  She said she didn't.

16     Q    Anything else?

17     A    The one with the affidavit and the statements

18  that's also involved in that final notice that we --

19  that we was talking about.

20     Q    The final --

21     A    This one here is what we're talking about

22  (indicating).

23     Q    And this is Exhibit 11.  Do you know what role

24  Ms. Kirby took in drafting Exhibit 11, if any?

25     A    No, I don't know.

1    Q    Was she present when this reprimand, verbal --

2    or final warning was given to you?

3    A    Of course.  There's her signature.

4    Q    So she was in a meeting with you that day?

5    A    That's correct.

6    Q    Where did that meeting take place?

7    A    In the main office.

8    Q    And Carlos Garcia was there that day, too?

9    A    That's correct.

10    Q    But you're not alleging that Carlos did

11    anything retaliatory; right?

12    A    No.

13    Q    Just Teresa?

14    A    That's correct.

15    Q    All right.  Other than what we've discussed, is

16    there anything else that you believe Ms. Kirby did that

17    was retaliatory?

18    A    That's it.

19    Q    How about Mr. Godfrey, what do you believe he

20    did that was retaliatory against you?

21    A    He -- he made a false statement about the

22    meeting that we had in the office with Ms. Turner.  I

23    think he said something about that somebody was loud and

24    boisterous and whatever.

25    Q    And you're talking about the meeting with

1    Ms. Turner. Was that the July 21st meeting?

2        A    Right. Yeah, she had him in there as a

3    witness.

4        Q    So the -- do you know whether Mr. Godfrey had

5    knowledge of your EEOC charges when you met -- when he

6    met with you guys on July 21st?

7        A    I believe he did. I believe Ms. Turner told

8    him.

9        Q    But you don't know for sure?

10       A    No.

11       Q    So what else, if anything, did Mr. Godfrey do

12   in your opinion that was retaliation?

13       A    That was -- they just recruited him, I think,

14   no more than the day or day before that because that's

15   when he got his promotion, and he was the one that was

16   supposed to bring me into the office.

17       Q    How about Ms. Deming, the -- is the retaliation

18   that you're alleging against her, does that all have to

19   do with the overpayment deductions?

20       A    Yes.

21       Q    And nothing else other than the overpayment

22   deductions?

23       A    No. And -- and I can personally say that I

24   think that more or less she -- she was sorry that she

25   even got involved in it.

1    Q    So she had -- in your opinion, she did -- the

2    only acts of retaliation that she committed were the two

3    payroll deductions that we discussed from Exhibit --

4    A    Right.

5    Q    -- 24?

6    A    Uh-huh.

7    Q    Is that a yes?

8    A    That's correct.

9    Q    Now, as we sit here for deposition, have we now

10   discussed all of Wackenhut's alleged retaliatory

11   actions?

12   A    As far as I know.

13   Q    And other than what we've already discussed

14   today, you're not asserting any other types of claims in

15   this lawsuit; correct?

16   A    No.

17   Q    And we've discussed -- or have we discussed all

18   the facts supporting your discrimination and retaliation

19   claims?

20   A    As far as I'm concerned.

21       (Defendant's Exhibit No. 26 was marked.)

22   BY MR. FERGUSON:

23   Q    Mr. Jones, I've handed you what we've marked as

24   Exhibit 26.  Do you have that document in front of you?

25   A    Yes, right here.

1     Q    Have you seen that document before?

2     A    Yes, I have.

3     Q    And what is this document?

4     A    It's the determination of the charge.

5     Q    Is it the second right to sue notice that the

6  EEOC issued for you?

7     A    That's correct.

8     Q    And this is the right to sue notice that

9  pertains to your second and third EEOC charges; right?

10     A    That's correct.

11     Q    Because the first one we -- the first right to

12  sue notice that we looked at only related to your first

13  EEOC charge; right?

14     A    That's correct.

15     Q    Are you currently employed?

16     A    That's correct.

17     Q    And where do you work now?

18     A    Thorpe.

19     Q    And what type of company is that?

20     A    Same thing, security.

21     Q    Security.  And are you a security guard there?

22     A    That's correct.

23     Q    When did you start at Thorpe?

24     A    I can say about a year and two months ago.

25     Q    So that would be approximately --

1     A    November last year.

2     Q    November of 2006?

3     A    Right.

4     Q    What is your rate of pay at Thorpe?

5     A    $9.

6     Q    And what is the name of your supervisor there?

7     A    Oh, I don't know.  Bendolyn (phonetic).

8     Q    Is that a man or a woman?

9     A    Female.

10    Q    How do you spell her name?

11    A    Oh, I don't know.  I don't know.  Bendolyn.  I

12 don't know.

13    Q    Is that her first name or her last name?

14    A    That's her first name.  I don't know her last

15 name.

16    Q    How -- Ben -- if you could just try to spell

17 it, please.

18    A    B-E-N-L-E-N-Y.  I don't know how to spell her

19 name.

20    Q    And where is Thorpe located?

21    A    The Galleria.  400 Galleria Parkway.

22    Q    That's their address?

23    A    Uh-huh.

24    Q    Is that their corporate address?

25    A    That's correct.